[File No. 6568.]

KATHERINE SCHULTZ, Respondent, v. WINSTON & NEWELL COMPANY, a Corporation, and Herbert Asselstine, Appellants.

(283 N. W. 69.)

Opinion filed December 16, 1938.

*Dullam & Young,* for appellants.

*Sullivan, Fleck & Sullivan,* and *Jacobsen & Murray,* for respondent.

ENGLERT, Dist. J. This action was instituted by the plaintiff to recover damages for the alleged wrongful death of her unmarried son, Fred Schultz, under §§ 8321 and 8322 Comp. Laws 1913, as a result of an automobile collision.

In her complaint, she alleges that the collision and death resulted from the negligence of Herbert P. Asselstine, an employee of Winston & Newell Company.

The defendants, in their answer, allege that the collision and death resulted from the contributory negligence of the deceased.

The case was tried before the court and a jury. At the close of the evidence, defendants moved for a directed verdict on the ground that the evidence showed conclusively that decedent was guilty of contributory negligence. The motion was denied, and the case was submitted to the jury. The jury returned a verdict in favor of the plaintiff for the sum of $5,800.00. Judgment was entered thereon.

From this judgment and the order of the trial court denying their motion for judgment notwithstanding the verdict and denying a new trial, defendants appealed to this court.

On this appeal, they specify the following reasons or any one of them why this case should be reversed:

1. That the evidence conclusively shows that the deceased was guilty of such contributory negligence as will preclude a recovery as a matter of law.

2. That the damages allowed are excessive.

3. That the court erred in striking out a part of an answer given by a witness for defendants.

4. That one of the attorneys for the plaintiff made prejudicial statements in his argument to the jury.

The facts from the side of the plaintiff, essential to an understanding of the question of contributory negligence, are briefly these: On the night of August 18, 1935, the defendant, Asselstine, an employee of Winston & Newell Company, was delivering a truck load of groceries from Bismarck to points in western North Dakota and eastern Montana for the company. He was traveling on U. S. highway number 10. The truck was equipped with a van body, a trifle less than eight feet wide. At the front the body projected from "18 to 20 inches" out from the wheels. The truck had a carrying capacity of two and

a half tons. On this night it carried five tons of groceries. It passed through Glen Ullin about eleven P. M. At that time, it had no clearance lights and no left headlight. Its right headlight and tail-light were burning. Within three to five minutes after it passed through Glen Ullin, several young men left for Hebron, their home. About one mile and three-quarters west of Glen Ullin, they came upon the scene of the accident. The Ford, driven by Schultz, was lying diagonally across the road, with its front about three feet over the center thereof, and pointing northeast. The body of Schultz was lying a few feet to the west. The truck stood about 30 feet farther west, and along the north shoulder of the road. At that time, the right headlight and tail-light were burning on the truck. On testing the lights, the left headlight would not come on. The clearance lights came on except the one on the southwest corner of the body which had been knocked off by the impact. It had been raining some and was still raining a little. The road was surfaced with graveled scoria. With the aid of the headlights from Russell's car standing west of the accident and pointing east, and headlights of their car facing west, and a searchlight, they traced the dual wheel tracks of the truck from the Ford east. They led in a southeasterly direction for about six feet to a point about two feet south of the center of the road, then continued east for fifty feet where they found broken headlight glass from "two to three feet" south of the center of the highway. South of the glass they found half of the Ford hood. They traced the dual tracks from fifteen to twenty feet farther east, and they continued to run from two to three feet south of the center of the road. From about three feet west of the broken glass they traced a groove in the road west, running parallel with the south edge of the dual wheel tracks and "from 8 inches to a foot" apart. This groove led to the left front wheel of the Ford. The tire was off this wheel, and it was bent outwardly. The left headlight glass of the Ford was broken out. It was seven feet from the south shoulder of the road to the north edge of the broken glass. Just east of the broken glass there was a rise in the highway. At the foot of this rise there was a hollow. In this hollow there was a curve in the road to the north. At the end of the curve, going west, the rise began. It was forty or fifty feet from the hollow to the top of the road where the glass and hood were lying.

There were four eyewitnesses to the accident. Of these, Schultz is dead and Mr. Russell did not testify. The other two, A. M. Femrite and Asselstine testified for defendants. Femrite stated that he and Russell were driving from Dickinson to Mandan, their home, in Russell's car. Russell was manager and Femrite department manager of the Mandan Creamery & Produce Company. They passed the Schultz car three times between Hebron and where the collision occurred. Schultz had passed them twice. The accident happened after he passed them a third time. They had been driving from forty to forty-five miles per hour all the way. When Schultz passed this third time, the truck "was a few hundred feet" to the east. The Schultz car "swerved to the right and then to the left and hit this truck." He saw green lights on the truck. As far as he could remember both headlights were on. He could not definitely state but said: "I would say that we saw lights." He "believed the collision took place where the truck was standing." When he walked up to the accident, the truck was standing along the north shoulder of the road. He made no examination of the tracks or of the lights. Shortly after the accident, the truck was moved thirty feet west to permit Muggli's car to pass through and go for a doctor.

According to the testimony of Asselstine all the lights were on the truck from Bismarck to the place of the accident, and that they were all on after the collision except the left front body light. This was knocked off in the collision. He saw the Schultz car pass the Russell car "just as I got to the top of the rise," and from 150 to 200 feet west of the truck. After passing the Russell car, Schultz "turned left, back across the road," and hit the truck. At that time, the truck was standing still. The road "was straight where the accident happened." The truck was on the right side of the road when struck by the Ford.

■ On this evidence the defendants maintain that they were entitled to a directed verdict because it shows the deceased to have been guilty of contributory negligence, as a matter of law.

They cite and rely upon the following cases from this court: Costello v. Farmers Bank; 34 N. D. 131, 157 N. W. 982; Nordby v. Sorlie, 35 N. D. 395, 160 N. W. 70, L.R.A.1917B, 753; Billingsley

v. McCormick Transfer Co. 58 N. D. 913, 228 N. W. 424; and Bagan v. Bitterman, 65 N. D. 423, 259 N. W. 266.

These cases hold that a verdict of a jury, on questions of negligence and contributory negligence, will be set aside as a matter of law, when the facts and circumstances are such that but one inference or conclusion can reasonably and fairly be drawn therefrom, and that there is no reasonable basis for difference of opinion as to such inference or conclusion in the minds of reasonable men.

The evidence that Schultz' car swerved back and forth, and that it "turned left, back across the road," and hit the truck, is at variance with the physical facts and circumstances in the case. If the plaintiff's testimony is to be believed, then the collision occurred on the south seven feet of a twenty-six foot wide highway. After the impact, the truck dragged the Ford fifty feet west, and two feet or more on the south of the center of the road. From the evidence, the jury could also have inferred that the truck was coming up the hill on the wrong side of the road.

The testimony of Femrite as to lights on the truck and where the collision occurred is vague, indefinite and uncertain.

While the testimony of Asselstine is positive, it is in conflict with the evidence mentioned and, as stated by the Iowa Supreme Court in Hawkins v. Burton, — Iowa, —, 281 N. W. 342: "The jury was not bound to take the testimony of the defendant Burton as an absolute verity. It was warranted in considering not only the verbal testimony but all of the facts and circumstances surrounding the accident."

In this connection, it may be well to mention the testimony of Lawrence Muggli. He came upon the scene of the accident within ten or fifteen minutes after it happened. While he stated that all the headlights and clearance lights were on the truck at that time, he was mistaken as to the left front clearance light. This had been torn off in the collision.

But the defendants earnestly insist that it was the imperative duty of Schultz to have stopped his car within the clear vision of his lights. In support of this contention many cases from other jurisdictions are cited, and a very recent decision from this court—Bagan v. Bitterman, 65 N. D. 423, 259 N. W. 266, supra. In that case, this court said: "More and more the rule of safety—the rule that one must drive at

such a speed as to be able to stop within the assured clear distance ahead—is being recognized as the imperative duty of the driver." Of course that rule should not be carried to the extent of being an absolute shield and protection, under all circumstances, to the careless and negligent driver. In the Bagan Case, the truck was disabled, and it was impossible to avoid stopping. Our statute, § 24, chap. 162, Laws of 1927, provides that a disabled vehicle may be temporarily left standing on either paved or improved highways. Every operator of a motor vehicle is charged with knowledge of that law. Moreover, in the Bagan Case there was ample room to pass to the left of the truck, in keeping with the law of the road. Several others had passed about or shortly before the time Bagan ran into the rear of the truck. In that case there was no feasible excuse why a reasonably prudent and careful driver should not have seen the parked truck within the statutory range of his headlights, and avoided running into it.

In the case before us, the truck had just rounded a curve at the foot of a small hill, and the jury could well have inferred from the evidence that it came up this incline on the wrong side of the road, and met the Schultz car on the crest thereof, with a van body a trifle less than eight feet wide, no clearance lights, and no left headlight. According to the testimony of the plaintiff, the front of the van body projected out over the front wheels from eighteen to twenty inches. About six inches of the left front corner of the van body was involved in the collision. True, Femrite said that when Schultz passed the last time, he saw the truck coming "a few hundred feet" to the east, and Asselstine said, when he got to the top of the hill, he saw Schultz pass the Russell car from 150 to 200 feet to the west of his truck. But if the collision occurred where the broken headlight glass and half of the hood were lying, then the truck had just gotten on the level of the road at the top of the rise when the accident happened. Whether the deceased should have anticipated meeting a motor vehicle on the wrong side of the road, just beyond the crest of a rise in the road, with an unlighted van body projecting out over its front wheels from 18 to 20 inches; and no left headlight, presents a question of fact for the jury, and not one of law for the court.

In Kiviniemi v. American Mut. Liability Ins. Co. 20 Wis. 619, 231 N. W. 252, the court decided that, whether a driver of an automobile

colliding with the unlighted overhang of a truck traveling in the opposite direction at night, was contributorily negligent, presented a question of fact for the jury to determine from the facts and the inferences to be drawn from the facts in the case.

In Michigan, where the rule of safety is provided by statute, and strictly applied by an unbroken line of decisions, the court, in Parry Corp. v. Berner, 259 Mich. 621, 244 N. W. 180, ruled, on facts very much like those here, that "contributory negligence of automobile driver, whose car was struck by overhanging body of truck claimed to be unlighted, held for jury."

One of the cases cited by defendants in support of their contention, Lindquist v. Thierman, 216 Iowa, 170, 248 N. W. 504, 87 A.L.R. 893, quotes from another decision the following: "This duty does not extend so far as to require that it must always be possible to bring the car to an immediate stop on the sudden arising of a dangerous situation which the driver could not reasonably have anticipated." See also Motley v. Standard Oil Co. 61 N. D. 660, 240 N. W. 206.

Because of the able and elaborate brief submitted by counsel for defendants, and the earnest and convincing oral argument made, we have devoted more space to this point than may seem necessary.

Without further discussion, we conclude that the question of contributory negligence, on the facts and circumstances in this case, was one of fact for the jury to decide.

■ Are the damages awarded so excessive as to require setting the verdict aside?

The deceased was the youngest of seven living children. All the others had left home and were doing for themselves. Deceased remained at home and helped his father until his death, on May 13, 1933. The father left 1,300 acres of land. The plaintiff was given a life estate therein, and on her death, it passes to the children. On the death of the father, the deceased remained at home with his mother and the two operated the entire farm. The deceased, at the time of the accident, was 28 years of age, in good health, handy with tools and machinery, a competent farmer, and devoted to his mother. She was 74 years of age at the time of Fred's death, and in good health.

No mortality tables were introduced in evidence. Without such, it is argued, there is no way of determining her life expectancy. Sub-

stantial damages may be awarded under the wrongful death act, though no mortality tables are introduced in evidence. Rober v. Northern P. R. Co. 25 N. D. 394, 142 N. W. 22. Under our statute, the trial court may take judicial notice of the Carlisle tables and instruct the jury thereon, and this court, on appeal, may consider them, though they have not been offered in evidence. Ruehl v. Lidgerwood Rural Teleph. Co. 23 N. D. 6, 135 N. W. 795, L.R.A.1918C, 1063, Ann. Cas. 1914C, 680.

If mortality tables are introduced in evidence, they are not binding on the jury. Bright v. Thacher, 202 Mo. App. 301, 215 S. W. 788.

In that case the mother was 74 years of age. Her unmarried son, at the time of his death, was 49 years of age, and unclassified as to occupation. A verdict of $7,500.00 was held not to be so excessive as to require interference therewith by the appellate court. Under the mortality tables introduced in that case, the mother's expectancy was a little over six and sixty-eight hundredths years. The court stated that the jury observed the mother as a witness, and had an opportunity of noting her physical alertness, and her general appearance as to health, and from such observations could very properly come to the conclusion that she would live many years beyond the expectancy allotted to the average woman of her age by the mortality tables. This line of reasoning is strikingly applicable to the case before us. The following cases are also very much in point here: McMahon v. Flynn, 154 Minn. 326, 191 N. W. 902; Rocca v. Tuolumne County Electric Power & L. Co. 76 Cal. App. 569, 245 P. 468; and Berry v. Dewey, 102 Kan. 593, 172 P. 27.

Within reasonable limits and certain recognized principles there is no other hard and fast rule by which damages for wrongful death can be determined. They are not subject of exact measurement. While the jury was quite generous in awarding $5,800.00, we are unable to give a safe ground upon which we can say that the verdict is so excessive as to justify our interference therewith.

█ Did the trial court err in striking out a part of the answer to the following question? "Q. You could see the truck coming? A. Yes, we could see the truck coming. We sensed an accident, of course."

"We sensed an accident, of course," was stricken out upon the ground that it was a "conclusion." This part of the answer was clearly not

responsive to the question. The reason for the requested ruling was wrong, but the court's decision was right. · It is not the reason given· that determines the correctness of the court's ruling on evidence. The inquiry is: Was the ruling proper? It was clearly right in this matter.

■ Lastly, it is claimed that one of the attorneys for the plaintiff made prejudicial statements in his argument to the jury.

While the argument was taken down by the court reporter, no objection was made to any part of it, and no ruling asked for by the trial court. To predicate error on argument, statements or remarks of counsel during the trial, timely objection must be made and a ruling had thereon.

Erickson v. Wiper, 33 N. D. 193, 157 N. W. 592; State v. Kirsch, 66 N. D. 626, 268 N. W. 473; Kimm v. Wolters, 28 S. D. 255, 133 N. W. 277.

The fact that the court reporter reported the argument, does not bring the propriety of the argument here for review without objection and ruling made.

State v. Kirsch, 66 N. D. 626, 268 N. W. 473, supra; Bedford v. Penney, 65 Mich. 667, 32 N. W. 888.

Having made the argument one of the grounds for a new trial, does not present the matter for review on appeal, without timely objection having first been made in the trial of the case and a ruling made thereon by the court.

DeGrandchamp v. Slepski, 187 Mich. 430, 153 N. W. 660.

This disposes of all the assignments of error presented on this appeal adversely to the contention of the appellants. The judgment and order of the trial court are affirmed, with costs to respondent.

CHRISTIANSON, Ch. J., and MORRIS, SATHRE and NUESSLE, JJ., concur.

BURR, J., did not participate, Honorable M. J. ENGLERT, Judge of the First Judicial District, sitting in his stead.