Antoinette HOPKINS, Plaintiff
and Appellee,

v.

R.D. McBANE, M.D., an individual,
Defendant and Appellant,

and

the Mercy Hospital of Devils Lake,
North Dakota, a non-profit
corporation, Defendant.

Civ. No. 870138.

Supreme Court of North Dakota.

June 28, 1988.

Bickle, Coles & Snyder, Bismarck, for plaintiff and appellee; argued by Robert J. Snyder.

Degnan, McElroy, Lamb, Camrud, Maddock & Olson, Ltd., Grand Forks, for defendant and appellant; argued by Gerald J. Haga.

GIERKE, Justice.

R.D. McBane, M.D., has appealed from an order denying his motion to amend findings of fact and conclusions of law, an order denying his motion for a new trial, and the judgment entered in a wrongful death action brought by Antoinette Hopkins for the stillbirth of her child. We affirm.

This case was previously before us in *Hopkins v. McBane*, 359 N.W.2d 862 (N.D. 1984), in which we reversed the district court's summary judgment of dismissal upon concluding that § 32–21–01, N.D.C.C., "authorizes a wrongful-death action against one whose tortious conduct causes the death of a viable unborn child." *Id.*, at 865. Upon remand, the action was tried to the court on the merits.

Hopkins' membranes spontaneously ruptured at about 5 p.m. on April 1, 1980. She was admitted to Mercy Hospital shortly after midnight on April 2, 1980. As of 9 a.m. on April 2, when McBane saw Hopkins, hospital charts and records indicated that Hopkins had reported a spontaneous rupture of her membranes and had been leaking "green-tinged fluid." By 11:30 a.m. on April 3, fetal heart tones were less clear than they had been. At 12:30 p.m., Dr. Douglas Greves was unable to hear fetal heart tones. A Caesarean section was started at 1:38 p.m. on April 3 and Hopkins' child was stillborn. The trial court found that McBane's care of Hopkins and her unborn child failed to meet the applicable standard of care, and that the death of Hopkins' unborn child was proximately caused by that failure. The court concluded that Hopkins was entitled to recover damages "in the amount of $50,-000.00 for mental anguish and grief, and in the amount of $100,000.00 for loss of companionship, society and comfort."[1] Judgment was entered accordingly and McBane appealed.

McBane argues (1) that the trial court's findings of fact on negligence, proximate cause, and damages are clearly erroneous; (2) that the trial court erred in two evidentiary rulings, one refusing to allow Dr. Greves to express expert opinions, and the other allowing the use of certain treatises in the examination of witnesses; (3) that mental anguish and loss of society, comfort and companionship are not recoverable elements of damage in wrongful death actions; and (4) that the trial court erred in denying his motion for a new trial on the grounds that the damages awarded were excessive and on the insufficiency of the evidence on the matters of proximate cause and the standard of care exercised by McBane.

1. Findings of Fact

The trial court found that "the care provided the plaintiff and her unborn child by Dr. McBane did not meet the applicable standard in the community" and "the cause of death of plaintiff's unborn child, to a reasonable degree of medical certainty, was prolonged rupture of membranes with associated corioamnionitis, and probably beta streptococcus septicemia." McBane contends that those findings of fact are clearly erroneous.

"A physician is required to exercise such reasonable care and skill as are exercised ordinarily by physicians practicing in similar localities in the same general line of practice." *Winkjer v. Herr*, 277 N.W.2d 579, 583–584 (N.D.1979). "Generally, a prima facie case of medical malpractice must consist of evidence establishing the applicable standard of care, violation of that standard, and a causal relationship between the violation and the harm complained of." *Id.*, at 583.

■ Dr. Robert J. Bury, a physician testifying as an expert in obstetrics and gyne-

1. The parties have not raised, and we need not address, any issue with regard to whether those elements of damage were appropriately valued separately.

cology, testified on direct examination by counsel for Hopkins:

"Q Okay. We're getting down to the end here. Doctor, after having reviewed the records, after having taken a history from Antoinette, and based upon your training and your experience, to a reasonable degree of medical certainty, can you state, in your opinion, what the cause of death was for Nelvette Lynn McDonald?

"A Well, to a reasonable degree of medical certainty, I believe the cause of fetal death was prolonged rupture of the membranes with associated chorioamnionitis and probably a beta streptococcal septicemia of the infant.

"Q Doctor, again, the same question, based on your training and experience and having reviewed the records, to a reasonable degree of medical certainty, assuming now that a standard is being applied to a family practitioner in a hospital the size of Devils Lake, North Dakota, in your opinion, did Antoinette Hopkins, then known as McDonald, and her unborn fetus receive the minimum necessary standard of care to ensure that she would, in fact, be able to deliver a child?

"A No; I believe she did not.

\* \* \* \* \* \*

"Q Could you state why not?

"A In summary, I believe her prolonged rupture of the membranes was unrecognized; the meconium-stained amniotic fluid was not recognized; that undue time from the time of the onset of the ruptured membranes until delivery had elapsed, allowing a recognized infection, chorioamnionitis, to affect the mother and subsequently the unborn fetus and result in the death of that baby."

That testimony supports the trial court's findings of fact on negligence and proximate cause, and we conclude that the findings are not clearly erroneous.

McBane also argues that the trial court's finding of fact that "Plaintiff presented no evidence of pecuniary or economic loss" precludes the recovery of any damages in this case. We disagree. It is apparent that the court and counsel were treating "pecuniary" and "economic" as equivalents that included such things as lost wages and out-of-pocket losses as a category of damages distinct from mental anguish or loss of society.[2] Hopkins' failure to prove such strictly pecuniary losses as lost wages or out-of-pocket expenses does not preclude recovery of any damages.

### 2. Evidentiary Rulings

McBane argues that the trial court erred in refusing to allow Dr. Greves, who testified as a fact witness, to testify as an expert, in addition to Dr. James J. Kolars, on the applicable standard of care McBane owed Hopkins and her unborn child and whether or not McBane met that standard. Dr. Greves had not been disclosed as an expert witness in the discovery process. McBane made an offer of proof and has not demonstrated any prejudice from the court's refusal to allow Greves to testify as an expert.

---

2. What constitutes a "pecuniary" loss is troublesome. As this court said in *Henke v. Peyerl,* 89 N.W.2d 1, 10 (N.D.1958), "[n]o exact definition [of pecuniary loss] can be given as its meaning may vary with the circumstances of each case." The Legislature has recently categorized damages as simply "economic" or "noneconomic" in § 32–03.2–04, N.D.C.C.:

"*32–03.2–04. Economic and noneconomic damages for wrongful death or injury to person.* In any civil action for damages for wrongful death or injury to a person and whether arising out of breach of contract or tort, damages may be awarded by the trier of fact as follows:

"1. Compensation for economic damages, which are damages arising from medical expenses and medical care, rehabilitation services, custodial care, loss of earnings and earning capacity, loss of income or support, burial costs, cost of substitute domestic services, loss of employment or business or employment opportunities and other monetary losses.

"2. Compensation for noneconomic damages, which are damages arising from pain, suffering, inconvenience, physical impairment, disfigurement, mental anguish, emotional distress, fear of injury, loss or illness, loss of society and companionship, loss of consortium, injury to reputation, humiliation and other nonpecuniary damage."

Chapter 32–03.2, N.D.C.C., is effective only through June 30, 1993. S.L. 1987, ch. 404, § 15.

McBane argues that the trial court erred in allowing reference to and use of medical treatises that had not been disclosed to the defense prior to the start of the trial. In ruling on the objection to the treatises, the trial court said:

"Now, getting back to that part of the objection, the lateness of the response to the interrogatory, I guess is what this is, I will not rule those books inadmissible on that ground this morning. But, I will, in fact, in order to keep the record simple, what I'll do is I will direct that defense counsel confer with their experts about these volumes. And if they can in fact present some evidence or testimony showing that they are put at a substantial disadvantage by the lateness of this response and that they need time, then they may renew their objection and possibly couple that with a request for a continuance if they think that they can present me with evidence that would justify a continuance."

Counsel for Hopkins asserted in his brief that "[n]o evidence was later presented by the defendants to show that they were put at a disadvantage." McBane has neither drawn our attention to any record evidence presented to show that he was "put at a substantial disadvantage" nor demonstrated any prejudice.

Relying on *Benedict v. St. Luke's Hospitals*, 365 N.W.2d 499 (N.D.1985), McBane asserts that we have "recently held that it was proper for a trial court to refuse the admission (or use) of evidence as a proper sanction for not heeding ... the rules of discovery." Our determination in that case that the trial court did not abuse its discretion in refusing to allow evidence of the standards set by the Joint Commission on Accreditation of Hospitals, the intended use of which had not been disclosed, despite a discovery request therefor, does not mean that a trial court errs in failing to exclude the use of undisclosed treatises. We specifically noted in *Benedict, supra*, 365 N.W.2d at 504, that "the trial court has a discretionary authority to determine what sanctions, if any, are appropriate." We conclude that the trial court did not abuse its discretion in allowing use of the previ-

ously undisclosed medical treatises in this case.

### 3. Damages for Loss of Society, Comfort and Companionship, and Damages for Mental Anguish

McBane argues that no damages are recoverable in a wrongful death action for loss of society, comfort and companionship, or mental anguish.

#### a. Introduction

In 1808, Lord Ellenborough declared that "[i]n a civil Court, the death of a human being could not be complained of as an injury." *Baker v. Bolton*, 1 Camp. 493, 170 Eng.Rep. 1033 (K.B.1808). The decision "is one of the most criticized decisions in legal history" and led to the enactment of Lord Campbell's Act in 1846. S. Speiser & S. Malawer, *An American Tragedy: Damages for Mental Anguish of Bereaved Relatives in Wrongful Death Actions*, 51 Tul.L.Rev. 1, 5 (1976). As Professor Prosser observed in *The Law of Torts*, § 127, p. 902 (4th ed. 1971):

"The result was that it was more profitable for the defendant to kill the plaintiff than to scratch him, and that the most grievous of all injuries left the bereaved family of the victim, who frequently were destitute, without a remedy. Since this was intolerable, it was changed in England by the passage of the Fatal Accidents Act of 1846, otherwise known as Lord Campbell's Act, which has become a generic name for similar statutes. Every American state now has a statutory remedy for wrongful death."

Entitled "An Act for compensating the Families of Persons killed by Accidents," Lord Campbell's Act (9 & 10 Vict., ch. 93) provided in pertinent part:

"WHEREAS no Action at Law is now maintainable against a Person who by his wrongful Act, Neglect, or Default may have caused the Death of Another Person, and it is oftentimes right and expedient that the Wrongdoer in such Case should be answerable in Damages for the Injury so caused by him: Be it

therefore enacted by the Queen's most Excellent Majesty, by and with the Advice and Consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the Authority of the same, That whensoever the Death of a Person shall be caused by wrongful Act, Neglect, or Default, and the Act, Neglect, or Default is such as would (if Death had not ensued) have entitled the Party injured to maintain an Action and recover Damages in respect thereof, then and in every such Case the Person who would have been liable if Death had not ensued shall be liable to an Action for Damages, notwithstanding the Death of the Person injured, and although the Death shall have been caused under such Circumstances as amount in Law to Felony.

"II. And be it enacted, That every such Action shall be for the Benefit of the Wife, Husband, Parent, and Child of the Person whose Death shall have been so caused, and shall be brought by and in the Name of the Executor or Administrator of the Person deceased; and in every such Action the Jury may give such Damages as they may think proportioned to the Injury resulting from such Death to the Parties respectively for whom and for whose Benefit such Action shall be brought; and the Amount so recovered, after deducting the Costs not recovered from the Defendant, shall be divided amongst the before-mentioned Parties in such Shares as the Jury by their Verdict shall find and direct."

Lord Campbell's Act soon received a narrow construction of the damages recoverable under it in *Blake v. Midland Railway Co.*, 18 Q.B. 93, 109–111, 118 Eng.Rep. 35, 41–42 (1852):

"The title of this Act may be some guide to its meaning: and it is 'An Act for Compensating the Families of Persons Killed;' not for solacing their wounded feelings.... It seems to us that, if the Legislature had intended to go to the extreme length of giving, not only compensation for pecuniary loss, but a solatium ..., language more clear and appropriate for this purpose would have been employed.

\* \* \* \* \* \*

"[I]f the jury were to proceed to estimate the respective degrees of mental anguish of a widow and twelve children from the death of the father of the family, a serious danger might arise of damages being given to the ruin of defendants."

Those decisions were products of their times. In allowing the recovery of damages for loss of companionship, the Supreme Court of Michigan, in *Wycko v. Gnodtke*, 361 Mich. 331, 105 N.W.2d 118, 120–121 (1960), provided a brief glimpse of the value of life, especially that of a child, in nineteenth-century England:

"The judges so ruling we do not condemn. They were merely interpreting the statute in accordance with the social conditions of the day, which, presumably, the legislative body had in mind in the enactment of the legislation then under consideration. The rulings reflect the philosophy of the times, its ideals, and its social conditions. It was the generation of the debtor's prisons, of some 200 or more capital offenses, and of the public flogging of women. It was an era when ample work could be found for the agile bodies and nimble fingers of small children. Defoe's England was not long past. He noticed with approval that at Colchester and in the Tauton clothing region ' "there was not a child or in the villages round it of above five years old, but, if it was not neglected by its parents and untaught, could earn its bread." ' Halevy writes that the 'number of children employed in factories was so great in proportion to the adults that it was out of the question to restrict the working hours of children without restricting at the same time the hours of adults.' The apprenticeship of children to factory owners amounted to what Professor Trevelyan, Master of Trinity College, Cambridge, has described as 'a slave traffic.' 'The atrocities visited upon these boys and girls' it is reported in the Encyclopedia of the Social Sciences, 'literally driven

to death in the mills, form one of the darkest chapters in the history of childhood.' ...

"This, then, was the day from which our precedents come, a day when employment of children of tender years was the accepted practice and their pecuniary contributions to the family both substantial and provable. It is not surprising that the courts of such a society should have read into the statutory words 'such damages as they [the jury] may think proportional to the injury resulting from such death' not only the requirement of a pecuniary loss, but, moreover, a pecuniary loss established by a wage benefitless-costs measure of damages. Other losses were unreal and intangible and at this time in our legal history the courts would have no truck with what Chief Baron Pollock termed in Duckworth, supra, 'imaginary losses.' Loss meant only money loss, and money loss from the death of a child meant only his lost wages. All else was imaginary. The only reality was the King's shilling."

Fortunately, those social conditions no longer exist in our society. Unfortunately, rules imposed by judicial decisions borne of those social conditions persist today. *See generally Prosser & Keeton on Torts,* § 127 (5th ed. 1984) and S. Speiser, *Recovery for Wrongful Death 2d.* §§ 3:49, 3:52 (1975), observing that many courts do not allow the recovery of damages in wrongful death actions for such things as loss of society, association, companionship, comfort and affection, and most courts do not allow the recovery of damages for such things as grief, mental anguish, bereavement, anxiety, distress, or emotional pain and suffering. *Compare* S. Speiser & S. Malawer, *An American Tragedy, supra,* 51 Tul.L.Rev. at 8, observing that "[m]ost of the world's industrialized nations, apart from states within the British Commonwealth and the United States ... simply treat wrongful death actions in the same way as personal injury actions, at least as to the compensability of mental anguish."

Our wrongful death act, Ch. 32–21, N.D. C.C., is patterned after Lord Campbell's Act and in § 32–21–02, N.D.C.C., provides a similar measure of recovery: "In an action brought under the provisions of this chapter, the jury shall give such damages as it finds proportionate to the injury resulting from the death to the persons entitled to the recovery." In *Haug v. Great Northern Ry. Co.,* 8 N.D. 23, 77 N.W. 97, 101 (1898), involving a wrongful death action under § 5499, C.L.1887, this court determined: "Upon one point the cases are united, and that is that the only damages recoverable in this action are for the pecuniary loss. Nothing can be recovered for the loss of society or for damages in the way of solatium." We agree with the Michigan Supreme Court: "That this barbarous concept of the pecuniary loss to a parent from the death of his child should control our decisions today is a reproach to justice." *Wycko v. Gnodtke, supra,* 105 N.W.2d at 121.

### b. Loss of Society, Comfort and Companionship

■ Relying on *Larson v. Meyer,* 135 N.W.2d 145 (N.D.1965), McBane argues that "North Dakota does not allow recovery of damages for 'loss of society, comfort and companionship' even when it is alleged that they are of the type capable of being associated with an economic or pecuniary loss."

As we have already noted, this court held in *Haug v. Great Northern Ry. Co., supra,* 77 N.W. at 101, that "the only damages recoverable in this action are for the pecuniary loss. Nothing can be recovered for the loss of society." In *Scherer v. Schlaberg,* 18 N.D. 421, 122 N.W. 1000, 1002 (1909), the court held: "The rule regarding the measure of damages recoverable by the father for the death by wrongful act of a minor child seems to be the probable value of the services of the child during minority, considering the cost of support and maintenance during the early and helpless part of its life." Obviously, if that rule were literally followed today, "the average child would have a negative worth." *Sanchez v. Schindler,* 651 S.W.2d 249, 251 (Tex.1983). As the authors observed in *Prosser & Keeton on Torts,* § 127, p. 952 (5th ed. 1984):

"Where pecuniary loss to survivors is still the ostensible standard for recovery, the decedent who is not in the labor market has presented a special problem, since such a person is not making direct money contributions to survivors, and there is certainly no direct pecuniary loss. Yet it has almost always seemed unjust to say that a child, or nonworking wife or mother, or an aged person is worth nothing to his survivors, and juries have at times rendered substantial verdicts in such cases."

In *Stejskal v. Darrow*, 55 N.D. 606, 215 N.W. 83 (1927) and *Kalsow v. Grob*, 61 N.D. 119, 237 N.W. 848 (1931), this court specifically held that a father could not recover damages in a wrongful death action for loss of the society and companionship of a child. While clinging to the pecuniary loss standard, the court in *Henke v. Peyerl*, 89 N.W.2d 1, 9 (N.D.1958), however, held that the pecuniary damages recoverable for the wrongful death of a child included the " 'comfort * * * of a kind, faithful and loving child.' " The court in *Henke, supra*, 89 N.W.2d at 11, also held: "Pecuniary loss need not be established by proof in dollars and cents. A substantial loss will be presumed." The measure of damages allowed in *Henke, supra*, was reaffirmed in *Grenz v. Werre*, 129 N.W.2d 681 (N.D.1964). We note that in wrongful death actions not arising out of the death of a child, this court has taken an expansive view of the kinds of losses for which pecuniary damages may be recovered. *See Quam v. Wengert*, 86 N.W.2d 741 (N.D. 1957) and *Geier v. Tjaden*, 74 N.W.2d 361 (N.D.1955) (loss of care and protection, counsel, advice and other intangibles); *Dahl v. North American Creameries, Inc.*, 61 N.W.2d 916 (N.D.1953) (the value of nurture and instruction); *Umphrey v. Deery*, 78 N.D. 211, 48 N.W.2d 897 (1951) (loss of any benefit or advantage capable of being estimated in money).

As McBane has correctly pointed out, this court did say, in *Larson v. Meyer*, 135 N.W.2d 145, 158 (N.D.1965), that "[i]n construing this statute [§ 32–21–02, N.D.C.C.], this court has held that in an action thereunder damages are to be awarded only for pecuniary loss and may not be awarded for loss of society and companionship or in the way of solatium." The case did not involve an action to recover damages for the wrongful death of a child. Further, the statement in *Larson v. Meyer* was dictum supporting the court's determination that the trial court committed prejudicial error in the December 1962 jury trial of that action by receiving into evidence a Christmas card photograph of the Larson family when there was no dispute as to the decedent's identity, health or physical condition, and could only have been offered to arouse sympathy, passion, and prejudice. We do not glean from *Larson v. Meyer* an intention to overrule, disavow, or limit *Henke* and *Grenz*, which afforded recovery for the " 'comfort * * * of a kind, faithful and loving child,' " which falls within "loss of companionship, society and comfort" for which the trial court awarded damages in this case. Nor, for that matter, do we glean an intention to overrule, disavow or limit prior decisions, such as *Dahl, Geier*, and *Quam*, which allowed recovery for nurture, instruction, training, protection, care, advice, counsel, and other intangibles.

Were it not dictum, this court's statement in *Larson v. Meyer* that damages may not be awarded for loss of society and companionship would be an anachronism in this court's decisional history leading to the recoverability of damages for loss of society. It would also be an aberration in our regional jurisprudence. *See McKee v. Thompson*, 558 F.Supp. 68 (D.N.D.1983), in which Judge Van Sickle observed that courts in Iowa, Michigan, Minnesota, Nebraska, South Dakota and Wisconsin allow the recovery of damages for such losses. Loss of society and comfort "is an item usually recognized and made the basis for an award" [*Prosser & Keeton on Torts*, § 127, pp. 951–952 (5th ed. 1984)] in "what today is probably a numerical majority of jurisdictions" [S. Speiser, *Recovery for Wrongful Death 2d*, 3:49, p. 313 (1975)].

"One plausible explanation for the trend toward allowing these elements of damages is that the society, care and attention of a deceased parent or spouse

(for example) are 'services' having financial value which may be both measured and compensated. And, as was stated in the ATLA–NACCA Law Journal [18 NACCA L.J. 379 (1956)] with regard to the death of a minor child: 'The death of a minor child is a deep emotional wounding, and it may be admitted that there is a decided tendency for the law to compensate for the grievous injury to family feelings involved in the death of such children or, phrased otherwise, to place a money value upon that lost companionship, deprived presence, and the co-adventuring implicit in the parent-child relationship. This enlarged view suggests that these deprivations are "services," financially compensable, lost to the survivors of the deceased child. The sentimental aspects of family life may be materialized without being vulgarized.' " S. Speiser, *Recovery for Wrongful Death 2d,* § 3:49, p. 321 (1975). We conclude that one may recover damages for loss of society, comfort and companionship in an action for the wrongful death of a child. While previous decisions of this court have implicitly authorized such damages, we deem it appropriate to clarify the matter and overrule our prior decisions to the extent that they are contrary to the conclusion we reach in this case. Therefore, to the extent that *Kalsow v. Grob, supra,* and *Stejskal v. Darrow, supra,* held that a parent may not recover damages in a wrongful death action for the loss of the society and companionship of a child, those decisions are hereby overruled.

### c. Mental Anguish

■ In the preceding subdivision dealing with loss of society, comfort and companionship, "we were concerned with benefits of which the statutory beneficiaries had been deprived as a result of the death." S. Speiser, *Recovery for Wrongful Death 2d,* § 3:52, p. 327 (1975). We now turn to damages for mental anguish, in which "we are concerned with the beneficiaries' emotional response (over and above any tangible deprivation such as loss of companionship) to the death of a loved one." *Id.,* at 327.

Beginning with *Haug v. Great Northern Ry. Co.,* 8 N.D. 23, 77 N.W. 97 (1898), this court has consistently stated that damages may not be recovered for solatium or mental anguish. *See also Dahl v. North American Creameries, Inc., supra; Hyyti v. Smith,* 67 N.D. 425, 272 N.W. 747 (1937); *Stejskal v. Darrow, supra.* Other than *Larson v. Meyer,* 135 N.W.2d 145 (N.D. 1965), which we have already discussed in the preceding subdivision, and a passing reference in *Sheets v. Graco, Inc.,* 292 N.W.2d 63 (N.D.1980), we have not recently addressed this subject.

"The existence of physical pain as the result of a bodily wound is a fact which everyone knows and recognizes; but the extent of the pain, no one but the sufferer himself can appreciate." *Graham v. Western Union Tel. Co.,* 109 La. 1069, 34 So. 91, 93 (1903). Yet, we allow juries to consider and quantify that kind of suffering. "The existence of mental suffering by a parent for the loss of a child is a fact so universal and general that it also may be fairly assumed and recognized as existing in any given case." *Id.,* 34 So. at 93. Yet, we do not allow juries to consider and quantify that kind of suffering. We should.

"Without question, the death of one's own child is the greatest loss a parent may suffer, in terms of mental anguish." S. Speiser, *Recovery for Wrongful Death 2d,* § 4:23, p. 511 (1975). The emotional impact of the loss of a loved one equals or exceeds any pecuniary loss. *Id.,* § 355 at p. 344. Loss of companionship and comfort results in sorrow. *City of Tucson v. Wondergem,* 105 Ariz. 429, 466 P.2d 383, 387 (1970). "The destruction of the parent-child relationship results in mental anguish." *Sanchez v. Schindler,* 651 S.W.2d 249, 253 (Tex.1983). The death of one's child is a "grievous loss from which heart or soul suffers more than from pecuniary loss" and pecuniary damages "will not atone for the grief and anguish of the bereaved mother and father." *Kelley v. Ohio River R. Co.,* 58 W.Va. 216, 52 S.E. 520, 523 (1906).

"Human experience, as well as the literature of psychiatry and psychology bear abundant evidence of the debilitating effect of grief and the resultant depression. It is certainly no less real, and no more difficult to appraise, than the 'mental and physical pain and suffering' attendant upon personal injury that is awarded those who survive, or the pain and suffering prior to death that is recoverable as part of the death action here."

*In re Sincere Navigation Corp.*, 329 F.Supp. 652, 656 (E.D.La.1971). "[A] child's chief value to his family is emotional, not economic." Annot., *Recovery of Damages for Grief or Mental Anguish Resulting From Death of Child—Modern Cases*, 45 A.L.R.4th 234, 240 (1986).

The fact that damages for mental anguish may be difficult to measure in a wrongful death action is an insufficient reason to deny them altogether. Difficulty in measuring damages is a burden that should be borne by tortfeasors rather than their victims. Juries routinely measure other difficult damages.

"[M]ental suffering cannot be cured by money, any more than money can cure the loss of a leg or any other permanent injury; but the practice of compensating for lesser injuries while barring recovery for victims of greater injuries because they are too horrendous to be fully redressed, defies logic and defeats justice."

S. Speiser & S. Malawer, *An American Tragedy, supra*, 51 Tul.L.Rev. at 16. "Yet, in most states there exists the anomaly that while juries are permitted to consider and quantify the damaging effects of mental anguish in personal injury cases, they are prohibited from even considering this element of damages in death cases." S. Speiser, *Recovery for Wrongful Death 2d*, § 3:55, p. 340 (1975). That anomaly has existed in North Dakota.

NDJI–CIVIL 165 and 170 state that the fear of physical injury may lead to recovery of damages for mental anguish. NDJI–CIVIL 1230 states that damages for mental anguish may be recovered in personal injury actions but not for wrongful death. *Smith v. American Family Mut. Ins. Co.*, 294 N.W.2d 751 (N.D.1980), recognizes that an insurer can be liable to an insured for emotional distress. A personal injury under Ch. 32–12.1, N.D.C.C., includes mental anguish and suffering. *McCroskey v. Cass County*, 303 N.W.2d 330 (N.D.1981). Those few examples show that damages for mental anguish are recoverable in other kinds of actions in North Dakota.

"The common law rule ... that no compensation may be awarded in a wrongful death suit to the relatives of the deceased for their mental anguish ... is based upon nothing more substantial than the nineteenth-century distrust of jurors' ability to assess emotional injuries fairly. Since jurors are now permitted to make such assessments in thousands of personal injury cases each year, there is no longer any rational basis for denying compensation to bereaved relatives for their mental anguish in wrongful death cases."

S. Speiser & S. Malawer, *An American Tragedy, supra*, 51 Tul.L.Rev. 1.

It is anomalous to allow juries to consider mental anguish in personal injury actions, but not in wrongful death actions. That anomaly is inconsistent with "the high regard with which we view the right to a jury trial." *General Elec. Credit Corp. v. Richman*, 338 N.W.2d 814, 818 (N.D.1983). We believe that this anomaly is an anachronism which should be eliminated. We see no good reason to continue to allow the recovery of damages for mental anguish to persons who fear physical injury from a negligent act or recovery of damages for the pain and suffering occasioned by a broken arm, while denying recovery of damages for the mental anguish occasioned by the wrongful death of a loved one. The mental anguish in either type of case is as real and as quantifiable as in the other. The allowance of damages for mental anguish in personal injury actions, but not in wrongful death actions, is illogical and unjust.

It might be argued that allowing the recovery of damages for mental anguish in

wrongful death actions should be left to the Legislature. It was judges, however, who adopted the rule that such damages are not recoverable and judges can remove the prohibition. The reasons underlying the rule against recovery of damages for mental anguish in wrongful death actions no longer exist. The Legislature has provided an aid to the just application of the wrongful death statutes in such circumstances: "When the reason of a rule ceases so should the rule itself." § 31–11–05(1), N.D.C.C. Because the reasons underlying the rule against recovery of damages for mental anguish in wrongful death actions no longer exist, the rule should also cease to exist. This is consistent with our determination in the earlier appeal in this action, *Hopkins v. McBane, supra,* 359 N.W.2d at 865, that § 32–21–01, N.D.C.C., is a "remedial statute" that "should be construed liberally to accomplish its objective" and "authorizes a wrongful-death action against one whose tortious conduct causes the death of a viable unborn child." It is also consistent with the general language of § 32–21–02, N.D.C.C., which directs the jury to "give such damages as it finds proportionate to the injury resulting from the death." That language "allows the jury to take account of changing moral attitudes in the society which indicate greater sensitivity to injuries resulting from death." *McKee v. Thompson, supra,* 558 F.Supp. at 70. In our view, it is time to remove the judicial impediment to that consideration which our previous decisions imposed. We conclude that damages for mental anguish may be recovered in a wrongful death action and our decisions to the contrary are, to that extent, overruled.[3] While ours is a minority position, we note that we are not alone in allowing damages for mental anguish in actions to recover damages for the wrongful death of a child. *See, e.g., Tommy's Elbow Room, Inc. v. Kavorkian,* 727 P.2d 1038 (Alaska 1986); *Dawson v. Hill & Hill Truck Lines,* 206

Mont. 325, 671 P.2d 589 (1983); *Sanchez v. Schindler, supra; City of Tucson v. Wondergem, supra. See also* Annot., *Recovery of Damages for Grief or Mental Anguish Resulting From Death of Child—Modern Cases,* 45 A.L.R.4th 234 (1986) (observing, at p. 241, that Arkansas, Delaware, Florida, Kansas, Maryland, Ohio, Virginia, and West Virginia have specifically allowed such damages by statute,[4] and, at pp. 248–253, that courts in Louisiana, Montana, South Carolina, and Texas have allowed such damages under general loss statutes like ours).

### 4. Excessive Damages and Insufficient Evidence

McBane argues that the damages awarded "are excessive as a matter of law and indicate passion and prejudice as the basis for the same .... since no evidence was submitted upon which rational fiscal and financial calculations could be made."

█ In wrongful death actions, substantial damages will be presumed, although there are no hard and fast rules for determining the amount of damages, which are not susceptible to precise arithmetical calculation, and the exact amount of recoverable damages must, therefore, be left to the good judgment of the trier of fact, and need not be established by proof in dollars and cents. *See generally Dugas v. Felton,* 249 N.W.2d 215 (N.D.1976); *Perleberg v. General Tire & Rubber Co.,* 221 N.W.2d 729 (N.D.1974); *Grenz v. Werre, supra; Anderson v. Schreiner,* 94 N.W.2d 294 (N.D.1958); *Henke v. Peyerl, supra; Lake v. Neubauer,* 87 N.W.2d 888 (N.D.1958); *Schultz v. Winston & Newell Co.,* 68 N.D. 674, 283 N.W. 69 (1938).

The issue of the amount of damages is a question of fact and, therefore, our review is subject to the limitations imposed by Rule 52(a), N.D.R.Civ.P. *Pfliger v. Peavey Co.,* 310 N.W.2d 742 (N.D.1981). Quoting *Cook v. Stenslie,* 251 N.W.2d 393, 396

---

**3.** Included among the decisions hereby overruled in part are *Larson v. Meyer,* 135 N.W.2d 145 (N.D.1965); *Dahl v. North American Creameries, Inc.,* 61 N.W.2d 916 (N.D.1953); *Hyyti v. Smith,* 67 N.D. 425, 272 N.W. 747 (1937); *Stejskal v. Darrow,* 55 N.D. 606, 215 N.W. 83 (1927);

and *Haug v. Great Northern Ry. Co.,* 8 N.D. 23, 77 N.W. 97 (1898).

**4.** *See also* § 32–03.2–04, N.D.C.C., set out in footnote 2, *supra.*

(N.D.1977), in *Jim's Hot Shot Serv. v. Continental Western Ins. Co.*, 353 N.W.2d 279, 281–282 (N.D.1984), we recently said that "the standard for determining what constitutes an excessive verdict varies but generally includes one or more of the following:

" '[T]he amount is so unreasonable and extreme as to indicate passion or prejudice on the part of the jury; the award is so excessive as to be without support in the evidence; the jury verdict is so excessive as to appear clearly arbitrary, unjust, or such as to shock the judicial conscience, 22 Am.Jur.2d *Damages* § 366.' [Case cites omitted.]"

■ Antoinette has sons, but no daughters, and will be having no more children. Thus, she lost her only daughter. In Antoinette's Native American society, the traditions and culture are passed down through the women. Antoinette would have taught her daughter the "values and the ways of the Indian people, the way we live." In her society, the women are very close, and she would have anticipated having a closer relationship with her daughter than with her sons. When she sees children on the streets, Antoinette wonders what her daughter would look like, how big she would be, and "what we'd be doing." Antoinette testified that she thinks about her daughter every day and will never forget her. Antoinette's mother testified that six years later, Antoinette still talked about the baby "[p]robably every week that I see her." As in *Schultz v. Winston & Newell Co.*, *supra*, 283 N.W. at 73–74, "we are unable to give a safe ground upon which we can say that the verdict is so excessive as to justify our interference therewith." We conclude that the trial court's findings of damages in the amount of $50,000 for mental anguish and grief and $100,000 for loss of companionship, society and comfort are not clearly erroneous.

McBane argues that the trial court erred in denying his motion for a new trial based upon the insufficiency of the evidence to support the court's findings on proximate cause and the standard of care. A movant in a motion for new trial based upon the insufficiency of the evidence "is asking the trial court to decide whether or not the verdict is against the weight of the evidence." *Okken v. Okken*, 325 N.W.2d 264, 269 (N.D.1982). The court's findings are not against the weight of the evidence and we find no abuse of discretion in the trial court's denial of McBane's motion for a new trial.

The judgment is affirmed.

MESCHKE, J., and VERNON R. PEDERSON, Surrogate Justice, concur.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of ERICKSTAD, C.J., disqualified.

VANDE WALLE, Justice, concurring specially.

Ordinarily I believe the Legislature should enact legislation if there is to be a substantial change in our law in order that the various consequences of such a change may be considered and discussed through the legislative study and hearing process and in order that the precipitous change resulting from a judicial decision in a particular case may be avoided. As an example, in *Morgel v. Winger*, 290 N.W.2d 266, 267 (N.D.1980), we held that the question of a child's right to recover for loss of parental consortium is one of policy and that "the birth of the child's cause of action for loss of parental consortium should be attended to by the Legislature as its obstetrician." The issues involved in the case before us are similar in nature and ordinarily I would adhere to the position set forth in *Morgel*. However, although it does not control this particular case, the Legislative Assembly enacted a statute codified as Section 32–03.2–04, N.D.C.C.[1] That section, quoted at length in the major-

---

1. Section 4 of Chapter 404, 1987 N.D. Laws, provides that the Act (Section 32–03.12–04 is section 4 of that Act) applies to claims for relief which accrue after the effective date of the Act. The Act was effective July 8, 1987. I do not apply the Act to the case before us. I simply conclude that in view of the legislation there is no longer any reason to continue the rule prohibiting the recovery of damages for mental anguish and loss of society, comfort, and companionship in a wrongful-death action.

ity opinion, provides that in an action for wrongful death or injury, compensation may be awarded for noneconomic damages which are defined as damages arising from "pain, suffering, inconvenience, physical impairment, disfigurement, *mental anguish, emotional distress,* fear of injury, loss or illness, *loss of society and companionship, loss of consortium,* injury to reputation, humiliation and other nonpecuniary damage." [Emphasis supplied.] Although this statute, which does not limit the recovery of such damages to certain types of wrongful-death actions, does not govern the case before us, I see no purpose in adhering to our previous case law in this instance in view of the fact that after July 8, 1987, the effective date of the legislation, such damages may be recovered. The policy reasons for deferring to the Legislature have been satisfied and the Legislature has decided damages for mental anguish and loss of society, comfort, and companionship are recoverable elements in wrongful-death actions.

I concur in the majority opinion.

LEVINE, Acting C.J., concurs.