Phillip BENEDICT and Dorothy Benedict, Plaintiffs and Appellants,

v

ST. LUKE'S HOSPITALS, Fargo Clinic, Matt John Ehlen, M.D., and Dave W. Ellison, M.D., Defendants and Appellees.

Civ. No. 10656.

Supreme Court of North Dakota.

March 20, 1985.

Robert Vogel, Grand Forks, for plaintiffs and appellants.

Jack C. Marcil, of Tenneson, Serkland, Lundberg, Erickson & Marcil, Fargo, for defendant and appellee St. Luke's Hospitals.

Carlton J. Hunke, of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for defendants and appellees Fargo Clinic, Matt John Ehlen, M.D., and Dave W. Ellison, M.D.

VANDE WALLE, Justice.

This case involves a malpractice action brought by Phillip and Dorothy Benedict against the defendants, St. Luke's Hospitals (St. Luke's), Fargo Clinic, Matt John Ehlen, M.D., and Dave W. Ellison, M.D. The district court entered a judgment in favor of the defendants, based upon a jury verdict, from which Phillip and Dorothy have filed this appeal. We affirm.

On April 19, 1980, Phillip was treated at the St. Luke's emergency room on two separate occasions, once at 12:22 a.m. and again later that day at 10:55 p.m. On the first occasion, Phillip sought treatment at the emergency room for chest pain. He was examined by Doctor Ellison, tests were performed, and he was then sent home. Later that day, Phillip was brought to the emergency room in an ambulance with symptoms of chest pain. He was again examined by Dr. Ellison and more tests were performed. Dr. Ellison conferred by telephone with Dr. Ehlen, Phillip's personal physician, and Phillip was again sent home.

Within eight hours after Phillip's second visit to the St. Luke's emergency room, he experienced a heart attack at home and was taken by ambulance to St. Ansgar Hospital in Moorhead where he was attended by Dr. Carlisle. Phillip sustained severe injuries, including brain damage, as a result of the heart attack.

Phillip and Dorothy filed an action against the defendants alleging that, by failing to hospitalize and continue observation of Phillip, the defendants violated applicable standards of care causing Phillip's serious injuries and resulting damages.

In substance, the Benedicts have raised the following issues:

(1) Whether or not the court erred in permitting defense counsel to place an improper standard of care before the jury during closing argument;

(2) Whether or not the court erred in refusing to allow evidence of or to give an instruction relating to the duty of St. Luke's to comply with the standards of the Joint Commission on Accreditation of Hospitals (JCAH standards);

(3) Whether or not the court erred in refusing to instruct the jury that St. Luke's had an independent duty of care toward Phillip apart from any vicarious liability that St. Luke's might incur as the result of an ostensible agency of the defendant doctors;

(4) Whether or not the court erred in giving the jury an improper contributory negligence instruction;

(5) Whether or not the court erred in refusing to admit into evidence certain authoritative text materials; and

(6) Whether or not the court improperly limited the testimony of the Benedicts' expert witness.

The Benedicts assert that the trial court erred in permitting defense counsel to place an improper standard of care before the jury during closing argument. More specifically, they assert that, although the jury was instructed that a national standard of care was applicable, the court permitted defense counsel to argue a local or community standard. We do not believe that the trial court permitted defense counsel to argue an impermissible standard of care to the jury during closing argument.

The instruction submitted to the jury by the trial court relating to the standard of care a doctor must use in treating a patient was not objected to by counsel for the Benedicts. That instruction, which was substantively similar to the instruction pro-

posed by Benedicts' counsel, provided in relevant part:

"[The Physician] must exercise the care and skill ordinarily possessed and exercised by, and reasonably expected of, other physicians engages [sic] in similar practice.

. . . . .

"A medical specialist must exercise the care and skill ordinarily possessed and exercised by, and reasonably expected of, other specialists engaged in similar practice.

. . . . .

"The standard for a physician who is not considered as a medical specialist is that he must exercise the care and skill ordinarily possessed and exercised by, and reasonably expected of, other physicians engaged in similar practice.

"The standard for a physician who is considered as a medical specialist is that he must exercise the care and skill ordinarily possessed and exercised by, and reasonably expected of, other specialists engaged in similar practice.

"A violation of the applicable standard by a physician is a form of negligence which we call malpractice."

The foregoing standard became the law of this case for the Benedicts because they did not object to it.

█ We have reviewed the closing argument made by counsel for the defendant doctors. During that argument, counsel correctly related to the jury the standard of care for a physician and for a medical specialist as set forth by the court in the instruction. However, during closing argument, defense counsel also made the following statements to which the Benedicts specifically objected as constituting improper argument of the standard of care:

"There's no evidence here that the standards of Dr. Friedman's practice out at San Diego, California, in a Class 1 hospital are at all similar to the standards practiced that Dr. Ehlen had here in Fargo, North Dakota, in April of 1980.

. . . . .

"There is no similarity in the practice.

. . . . .

"There has been no expert testimony here by anyone who knows what the standards of practice are similar to Fargo who has come in to tell you that those standards were violated. The only doctors familiar with the practice of specialists like Dr. Ehlen and practice of a doctor like Dr. Ellison in Fargo, North Dakota, are those doctors who have testified here from the Mayo Clinic.

. . . . .

"The only doctors who would know what a similar practice to Fargo, North Dakota, are the doctors that testified from the Mayo Clinic.

. . . . .

"We're saying it's the standard for doctors engaged in a similar practice as Dr. Ehlen, either in Fargo or communities like Fargo.

"In this case the Mayo Clinic doctors know this area and know these kinds of practices, because they treat patients from all around this area. They have patients that come to them which they treat that they have to send home. They have to know what similar practices are in other communities."

When defense counsel objected that the foregoing statements constituted use of an improper standard of care, the court responded:

"THE COURT: The Court will instruct the jury that the standard of care is that standard which is engaged in a similar practice."

The trial court instructed the jury that the argument or other remarks of counsel were not to be considered as evidence in the case. The jury was also instructed to decide the case solely on the evidence presented during the trial and the law as given to the jury by the court in its instructions. By those admonitions to the jury, the trial court effectively precluded the possibility of prejudice resulting from de-

fense counsel's remarks during closing argument.

■ Furthermore, the statements of defense counsel to which the Benedicts object were made in an obvious attempt to persuade the jury that the defendants' witnesses were more capable than the plaintiffs' witnesses of ascertaining whether or not the defendant doctors exercised the requisite care and skill of others engaged in a similar practice. They were appropriate statements directed at discrediting the Benedicts' evidence that the defendant doctors had failed to exercise the requisite degree of care and skill. We conclude that reversible error did not occur during defense counsel's closing argument with regard to this issue.

The Benedicts also assert that the trial court erred in refusing to allow evidence of or to give an instruction relating to hospital standards set by the Joint Commission on Accreditation of Hospitals (JCAH).

During the discovery process, St. Luke's served interrogatories upon the Benedicts requesting them to state which "accepted medical practices, customs and medical standards" they were alleging that St. Luke's had violated. In their response to those interrogatories, the Benedicts did not refer to the JCAH or other specific standards. Consequently, St. Luke's served a single supplemental interrogatory upon the Benedicts:

"Please specify the basis for your answer which stated that the 'accepted and customary medical practice' would have been to admit the Plaintiff, Phillip Benedict. If your answer is based upon some specific guidelines or standards established by organizations such as the American Hospital Association, Joint Commission of the Accreditation of Hospitals, or other medical standards establishing body, please specify the organization and the location of the particular standard upon which you rely."

To that supplemental interrogatory, the Benedicts responded as follows:

"*Answer:* The basis for our answer to the prior interrogatory [number 13], as quoted above, was information obtained from experts who were not retained by us and who will not be called as witnesses.

"The names and opinions of such experts are not discoverable without special showing of good cause, not present here. See Rule 26(b)(IV)(B), and Wright & Miller, § 2033."

At no time during the discovery process did the Benedicts inform the defendants, although requested to do so through the foregoing interrogatories, that they intended to rely upon the JCAH standards.

During the trial, counsel for St. Luke's objected to the Benedicts' attempts to refer to or present evidence of the JCAH standards. The trial court, in sustaining the objection, clearly indicated that it was doing so as a sanction for the Benedicts' failure to adequately respond to the foregoing interrogatory request:

"I can place no other interpretation than a request was made for specific medical standards. The question was again repeated whereby the Defendant who has asked for more specificity and that the question be answered with more particularity. Again the answer only referred to matters other than the standards set out by the joint commission of accredited hospitals. The Defendant whose attorney says it would require a postponement of this case in order to counteract this with additional witnesses that were not anticipated, I suppose, if this matter had not come up. I'm going to sustain the Motion of the Defendant hospital that the matter of the standard was—the joint commission on accreditation of hospitals not being used for the reason that the Plaintiffs have failed to answer interrogatories along this line and that the bringing of this medical standard into evidence at this time causes possible prejudice to the Defendant Hospital."

■ The failure to adequately respond to or supplement interrogatories constitutes a discovery violation for which no sanction is provided under Rule 37 of the North Dakota Rules of Civil Procedure. In such a

situation, the trial court has a discretionary authority to determine what sanctions, if any, are appropriate. See *Minnkota Power Co-op., Inc. v. Manitowoc Company, Inc.,* 669 F.2d 525, 528–529 (8th Cir.1982). See also *Schwartz v. Ghaly,* 318 N.W.2d 294 (N.D.1982); *Delzer Construction Company v. South Dakota State Board of Transportation,* 275 N.W.2d 352 (S.D. 1979).

Our conclusion that such authority exists is supported by Wright & Miller, *Federal Practice and Procedure: Civil § 2050,* pp. 325–326 (1970):

> "Failure to supplement a response when a duty to do so exists is not functionally distinguishable from simply making an incorrect response in the first instance; the sanctions that may be imposed by the court are the same in each situation.

> .    .    .    .    .

> "In the absence of a rule speaking to the question, reliance must be on the inherent power of the court. There has been a reluctance to use inherent power as the basis for sanctions, and it would have been desirable to tie Rule 37 directly to the situation here being discussed, but since this was not done the courts must be held to have inherent power to protect the integrity of their processes by imposing sanctions for giving an incorrect response and for failing to supplement a response.

> "The court necessarily has wide discretion in these matters." [Citations omitted.]

■ The interrogatories, and particularly the supplemental interrogatory, specifically requested the Benedicts to indicate whether or not they were relying upon the JCAH or other standards in their action against St. Luke's. The clear implication of their response was that they were not relying upon the standards, and the Benedicts do not now assert on appeal that they had insufficient knowledge at that time to make a more adequate response. Accordingly, we conclude that the trial court did not abuse its discretion in refusing to allow

evidence of, or to submit to the jury an instruction regarding, the JCAH standards.

The Benedicts also assert that the trial court erred in refusing to instruct the jury that St. Luke's owed an independent duty to Phillip separate from any vicarious liability the Hospital might incur. The Benedicts assert that St. Luke's had an independent duty to staff its emergency room with competent doctors and staff. The trial court explained its reason for refusing to instruct with regard to an independent duty of the hospital:

> "I am instructing the jury that for all purposes it's a question of fact whether the hospital is the principal to the agents, the doctors. And if there is ostensible agency developed, knowledge by the Plaintiffs that they were not agents cancels out any type of ostensible agency, so I will not instruct the jury as to the duty of the hospital because I've told them if the doctors are negligent, the hospital's liable unless there's lack of an ostensible agency."

■ The existence of a duty by a hospital to exercise reasonable care in staffing its emergency room is recognized by substantial authority. See *Pedroza v. Bryant,* 101 Wash.2d 226, 677 P.2d 166 (1984); *Johnson v. Misericordia Community Hospital,* 99 Wis.2d 708, 301 N.W.2d 156 (1981); *Fjerstad v. Knutson,* 271 N.W.2d 8 (S.D.1978); see also Annot., *Hospital's Liability for Negligence in Selection or Appointment of Staff Physician or Surgeon,* 51 A.L.R.3d 981 (1973). The trial court should have instructed the jury that, upon finding Dr. Ellison negligent in his treatment of Phillip, it could find St. Luke's liable for negligence in staffing its emergency room irrespective of whether or not there existed an ostensible agency between St. Luke's and Dr. Ellison. We conclude that, under the circumstances of this case, the trial court erred in refusing to give the jury such an instruction.

We further conclude, however, that the trial court's failure to give such an instruction constituted harmless error. Because

the jury found that neither Dr. Ellison, the doctor on duty in the emergency room, nor Dr. Ehlen, Phillip's personal physician with whom Dr. Ellison conferred, acted negligently, the jury could not have found that a breach of duty by St. Luke's to provide competent staff in its emergency room was a proximate cause of Phillip's injuries. See *Clark v. Harris Hospital*, 543 S.W.2d 743 (Tex.Ct.Civ.App.1976). If the jury found, as we must assume it did in this case, that the emergency room physician exercised the care and skill ordinarily possessed, exercised by, and expected of other emergency room physicians,[1] then the hospital's failure to exercise reasonable care in selecting the doctor to staff its emergency room could not be a proximate cause of Phillip's injuries. We conclude, therefore, that the trial court's failure to instruct on the hospital's independent duty did not constitute reversible error.

The Benedicts also assert that the trial court erred in submitting the following instruction to the jury:

"A patient is required to cooperate in a reasonable manner with his treatment. This means that a patient has a duty to listen to his doctor, truthfully provide information to his doctor upon request, follow reasonable advice given by his doctor, and cooperate in a reasonable manner with his treatment. A patient also has a duty to disclose material and significant information about his condition or habits when requested to do so by his physician."

The Benedicts assert that although the trial court ruled that it would not instruct on contributory negligence because there was no evidence of it, the court nevertheless submitted the foregoing instruction which, the Benedicts assert, constituted a contributory-negligence instruction.

■ It is well settled that jury instructions must be considered as a whole, and if, when so considered, they fairly and adequately apprise the jury of the law, they are sufficient even though parts of them standing alone may be erroneous or insufficient. See *South v. National Railroad Passenger Corporation*, 290 N.W.2d 819 (N.D.1980).

■ The trial court informed the parties that it was not requiring the jury to make a finding on the Benedicts' contributory negligence but was submitting the foregoing instruction to inform the jury that, relevant to the issue of a doctor's negligence, a patient is required to cooperate in a reasonable manner and to disclose material information requested by the doctor. The trial court refused to give a contributory-negligence instruction which was requested by the defendants. Furthermore, the special verdict form did not provide for a finding regarding Phillip's contributory negligence, and the jury made no such finding. In reviewing the foregoing instruction together with the instructions as a whole, we conclude that they fairly and adequately apprised the jury of the law, and therefore the submission of the foregoing instruction did not constitute error.

The Benedicts assert that the trial court committed error when it refused to allow them to introduce certain pages from the text titled "The Heart" during Dr. Spittel's deposition cross-examination. We disagree.

■ The trial court is accorded wide discretion in determining whether or not to allow or deny the use of evidence on the ground of relevancy. *Keller v. Vermeer Manufacturing Company*, 360 N.W.2d 502 (N.D.1984); *State v. Buckley*, 325 N.W.2d 169 (N.D.1982). The trial court correctly

---

1. Testifying by deposition, Dr. Ellison stated that he was an "emergency physician" by occupation. Because the jury was instructed to review the defendant doctors' conduct upon the basis of "physicians engaged in similar practice," we can assume that the jury reviewed Dr. Ellison's conduct based upon other emergency room physicians. It is unnecessary in this case to determine whether the trial court's failure to instruct the jury on a hospital's independent duty to competently staff its emergency room would have constituted reversible error if St. Luke's emergency room had been staffed by someone who was not an emergency room physician.

observed that the statement in the text "The Heart" which the Benedicts' counsel attempted to use in cross-examining Dr. Spittel related to the standard for avoiding a malpractice lawsuit rather than to the standard of care which the jury was instructed to use in judging the defendant doctors. We conclude, therefore, that the trial court did not abuse its discretion in denying admission of that evidence on the ground that it was not relevant.

The Benedicts assert that the trial court improperly limited the testimony of their expert witness, Dr. Friedman. More specifically, the Benedicts assert that the trial court refused to allow Dr. Friedman to testify as to the ultimate issue in the case.

Dr. Friedman was permitted to respond at considerable length to the following questions over the defendants' objections:

"Q. Do you have an opinion as to whether Dr. Ellison departed from the accepted standard of medical practice in the care and treatment he provided Phillip Benedict during the second emergency room visit on April 19th, 1980?

"A. Yes, I do.

"Q. What is that opinion?

.     .     .     .     .

"Q. Doctor, do you have an opinion as to whether Dr. Ehlen departed from the accepted standard of medical practice and care and treatment he provided to Phillip Benedict on April 19th, 1980 during his second emergency room visit?

.     .     .     .     .

"A. Yes, I do.

"Q. What is that opinion?

.     .     .     .     .

"Q. Do you have an opinion as to whether St. Luke's Hospital departed from accepted standards of medical practice in the care and treatment provided to Mr. Benedict during his two emergency room visits on April 19th, 1980?

"A. Yes, I do.

"Q. What is that opinion?

.     .     .     .     .

"Q. Doctor, do you have an opinion held with a reasonable degree of medical certainty as to whether Dr. Ellison's and Dr. Ehlen's departure from accepted medical practice caused harm to Phillip Benedict?

"A. Yes, I do.

"Q. What is that opinion?

.     .     .     .     .

"Q. Doctor, do you have an opinion held with a reasonable degree of medical certainty as to whether the hospital's departure from accepted medical standards of medical practice caused harm to Phillip Benedict?

"A. Yes, I do.

.     .     .     .     .

"Q. What is that opinion?"

We have carefully reviewed Dr. Friedman's testimony in its entirety, including his answers to the questions as to his opinion, quoted above. On several occasions the trial court did sustain objections to questions on the basis of irrelevance, inadequate foundation, or calling for a speculative answer. It is unnecessary to decide whether, in each instance, the trial court ruled correctly in sustaining the objections, because Dr. Friedman was ultimately allowed to testify, in substance, to all matters covered by the objected-to questions. Consequently, we conclude that there was no improper limitation of Dr. Friedman's testimony which constituted reversible error.

For the reasons stated in this opinion, we affirm the judgment of the district court.

ERICKSTAD, C.J., and PEDERSON, J., concur.

GIERKE, J., concurs in the result.

Surrogate Judge PEDERSON participated in this case by assignment pursuant to § 27–17–03, N.D.C.C.

Justice PAUL M. SAND, who died on December 8, 1984, was a member of this Court at the time this case was submitted.