## IN THE COURT OF APPEALS OF TENNESSEE,
## AT NASHVILLE

**FILED**

**January 12, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **RHONDA S. BRYANT, and husband**, | ) | Davidson County Circuit Court |
| **NATHAN G. BRYANT**, | ) | No. 96C-1013 |
| | ) | |
| Plaintiffs/Appellants. | ) | |
| | ) | |
| VS. | ) | C.A. No. 01A01-9801-CV-00046 |
| | ) | |
| **DAVID H. MCCORD, M.D., DAVID H.** | ) | |
| **MCCORD, d/b/a TENNESSEE SPINE** | ) | |
| **CENTER, INC., ACROMED** | ) | |
| **CORPORATION, ACROMED, INC.,** | ) | |
| **and COLUMBIA/HCA HEALTHCARE** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| **HCA HEALTH SERVICES OF** | ) | |
| **TENNESSEE, INC.,** | ) | |
| **d/b/a CENTENNIAL MEDICAL** | ) | |
| **CENTER**, | ) | |
| | ) | |
| Defendant/Appellee, | ) | |

From the Circuit Court of Davidson County at Nashville
**Honorable Walter C. Kurtz, Judge**

**Charles J. Williams**,
**John B. Carlson**,
WILLIAMS & ASSOCIATES, P.C., Nashville, Tennessee
**G. Thomas Nebel**, LAW OFFICES OF TOM NEBEL, P.C., Nashville, Tennessee
Attorneys for Plaintiffs/Appellants.

**C. J. Gideon, Jr.**,
**William S. Walton**,
GIDEON & WISEMAN, Nashville, Tennessee
Attorneys for Defendants/Appellees.

OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**TOMLIN, Sp. J.**: (Concurs)

Plaintiff Rhonda Bryant appeals an order of the trial court granting summary judgment in favor of Defendant Centennial Medical Center (CMC). We find, contrary to the ruling of the trial court, that there is a genuine issue of material fact regarding whether CMC violated a duty of care owed to Bryant. Thus, we reverse the portion of the trial court's order granting summary judgment to CMC with respect to Bryant's hospital malpractice claim. For reasons somewhat different than those cited by the trial court, we agree that the trial court properly granted summary judgment to CMC with respect to Bryant's remaining claims.

### *Factual and Procedural History*

Bryant sustained back injuries as a result of her involvement of two separate automobile accidents occurring in 1979 and 1992. Following the second accident, Bryant was examined by Dr. Steven McLaughlin. Dr. McLaughlin diagnosed Bryant's condition as kyphosis, a condition commonly known as curvature of the spine, and referred Bryant to Dr. David McCord, an orthopaedic surgeon.

Dr. McCord recommended that Bryant undergo surgery to correct her curvature of the spine. According to Bryant, Dr. McCord did not guarantee the results of the proposed surgery but did state that there was a high likelihood that the surgery would be a success and that Bryant could be as good as new and back to work within six months after the procedure. He further explained, however, that if the surgery was not a success, Bryant would have to undergo a second and more extensive surgical procedure. On May 3, 1993, Dr. McCord performed a surgical procedure on Bryant which involved the implantation of pedicle screws in Bryant's spine. After this first surgery, Bryant's back pain worsened. Six months after the surgery, Bryant was still unable to return to work. Nine months after the surgery, Bryant continued to take pain medication prescribed by Dr. McCord. On February 21, 1994, Bryant underwent a second surgery during which Dr. McCord replaced the pedicle screws implanted during the first surgery and inserted a "bone cage" in Bryant's spine.

Bryant continued to experience severe pain and take prescription pain medication following this second surgery. Bryant consulted Dr. John Campa regarding further treatment for her

continuing pain. While in the waiting room of Dr. Campa's office, Bryant met a woman who informed her that several lawsuits had been filed against Dr. McCord in connection with his use of pedicle screws. Bryant made arrangements to meet with the attorneys who represented the plaintiffs in the other lawsuits against Dr. McCord. Bryant also sought a second opinion from Dr. John Ditmer regarding her injuries. In June of 1997, Bryant underwent a third surgery to correct her back injuries. This procedure, which was performed by Dr. Michael McNamara, involved the removal of the hardware implanted in Bryant's spine by Dr. McCord and its replacement with other corrective hardware.

On March 18, 1996, Bryant filed an action against a variety of defendants including Centennial Medical Center (CMC), the facility where Dr. McCord performed the May 1993 and February 1994 surgeries.[1] During the same week that Bryant filed her complaint, approximately sixty identical lawsuits were filed by Bryant's attorneys on behalf of other individual plaintiffs. All of the cases were assigned to a single trial judge who selected twelve of the cases (including the action brought by Bryant) to proceed with discovery.

On May 6, 1997, CMC filed a motion for summary judgment with respect to all of Bryant's claims against CMC. On October 17, 1997, while CMC's motion for summary judgment was still pending, a Pennsylvania federal court approved a settlement agreement in a multiple district lawsuit against AcroMed, the manufacturer of the devices implanted in Bryant's spine during the May 1993 and the February 1994 surgeries. *See Fanning v. AcroMed Corp. (In re Orthopedic Bone Screw Prods. Liability Litigation)*, 176 F.R.D. 158 (E.D. Penn. 1997). By memorandum opinion dated October 30, 1997, the trial court granted CMC's motion for summary judgment. Bryant filed a motion to alter or amend the ruling which was denied by the trial court. Bryant has appealed the trial court's ruling with respect to her claims based on lack of informed consent,

---

[1]Bryant's complaint alleged a number of theories for recovery, including negligence, strict liability, failure to warn, negligent misrepresentation, fraudulent misrepresentation, breach of implied warranty, breach of express warranty, intentional infliction of emotional distress, fear of future illness and/or product failure, negligent infliction of emotional distress, violation of the Tennessee Consumer Protection Act, supply of a product dangerous for its intended use, doctor's medical malpractice, hospital's medical malpractice, battery, lack of informed consent, conspiracy, joint enterprise, negligence per se, and action in concert. On appeal we consider only Bryant's claims based on lack of informed consent, hospital malpractice, joint enterprise, and acting in concert.

hospital malpractice, joint enterprise, and acting in concert.

## *Issues*

The issues on appeal as we perceive them are as follows: (1) Are any or all of Bryant's claims against CMC barred by the AcroMed settlement agreement? (2) Are any or all of Bryant's claims against CMC barred by the statute of limitations? (3) Did the trial court err in granting summary judgment in favor of CMC with respect to Bryant's claims against CMC based on lack of informed consent, hospital malpractice, joint enterprise, and/or acting in concert?

## *Standard of Review*

Summary judgment is appropriate only if the party seeking summary judgment demonstrates that there are no genuine issues of material fact and further shows that, under the undisputed facts, the moving party is entitled to a judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 528 (Tenn. 1998)(citing *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993)). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of the nonmoving party and discarding all countervailing evidence. *See id.* at 529 (citing *Byrd*, 847 S.W.2d at 210-11). If there is a dispute as to any material fact or any doubt as to the conclusion to be drawn from the evidence, the motion must be denied. *See Dooley v. Everett*, 805 S.W.2d 380, 383 (Tenn. App. 1990)(citing *Phillips v. Pittsburg Consol. Coal Co.*, 541 S.W.2d 411, 413 (Tenn. 1976)). Because this is solely a legal determination, our review of the trial court's ruling on a motion for summary judgment is *de novo* with no presumption of correctness. *See White*, 975 S.W.2d at 528-29 (citing *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997); *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)).

## *AcroMed Settlement Agreement*

In December of 1996, a settlement agreement was reached in a lawsuit pending against AcroMed in a Pennsylvania federal court. The Pennsylvania district court issued an opinion

approving this agreement on October 17, 1997. ***See Fanning v. AcroMed Corp. (In re Orthopedic Bone Screw Prods. Liability Litigation)***, 176 F.R.D. 158 (E.D. Penn. 1997). In its memorandum opinion of October 30, 1997, the trial court in the instant case did not discuss the existence of this settlement agreement. On appeal, however, CMC contends that the agreement provides an additional basis for the dismissal of Bryant's claims against CMC. Thus, although the trial court did not rely upon the AcroMed settlement agreement when granting CMC's motion for summary judgment, we nevertheless address whether the agreement has any legal effect on Bryant's claims.

The AcroMed settlement agreement provides in pertinent part as follows:

> This Agreement shall be the exclusive remedy for any and all Settled Claims of Settlement Class Members and for any claims of Settlement Class Members against AcroMed and the Released Parties arising out of the subject matter of this Agreement and the Complaint. AcroMed and the Released Parties shall not be subject to liability or expense of any kind to any Settlement Class Member with respect to any Settled Claim or for any claim arising out of the subject matter of this Agreement, except as provided in this Agreement. When the Final Order and Judgment becomes Final, each of the Settlement Class Members shall be barred from initiating, asserting, or prosecuting any Settled Claims.

In determining whether this provision operates to bar Bryant's claims against CMC, we must first determine whether Bryant qualifies as a member of the settlement class. The AcroMed agreement defines the term "Settlement Class" as follows:

> **"Settlement Class"** shall mean all persons and entities wherever located, who have or may in the future have any claim (whether filed or unfiled, existing or contingent, and specifically including claims for alleged injuries and damages not yet known or manifest), . . . in any state or federal courts of the United States or the courts of its territories or possessions, against any or all of AcroMed and the Released Parties arising out of, based upon, related to, or involving Orthopedic Bone Screws that were implanted in the United States or its territories or possessions in an operation that occurred on or before December 31, 1996 . . . .

The agreement defines the term "Orthopedic Bone Screw" as follows:

> **"Orthopedic Bone Screw"** shall mean any screw, including but not limited to bone screws, cancellous bone screws, universal cancellous bone screws, sacral

screws, iliac screws, and pedicle screws, and/or related devices used with such screws as adjuncts to spinal fusion surgery, including but not limited to plates, rods, hooks, wires, cables, connectors, nails, clamps, washers, nuts, ramps, cages, and implants of any kind.

In the instant case, Bryant filed a claim in state court against AcroMed and other defendants. This claim is directly related to the implantation of pedicle screws and a bone cage in her spine prior to December 31, 1996. Thus, we conclude that Bryant is a member of the settlement class affected by the AcroMed agreement.

We next consider whether CMC is among the defendants affected by the AcroMed settlement agreement. The agreement states that its purpose is to "settle and resolve . . . all Orthopedic Bone Screw Related claims against AcroMed and the Released Parties." The terms and conditions of the agreement specifically require the dismissal of claims against AcroMed, the released parties, and the professional societies. The terms "released parties" and "professional societies" are defined as follows:

> **"Released Party/Parties"** shall mean and shall be limited to those persons and entities listed on Exhibit E to this Agreement.

> **"Professional Societies"** shall mean the American Academy of Neurological Surgeons ("AANS"), American Academy of Orthopedic Surgeons ("AAOS"), North American Spine Society ("NASS"), and Scoliosis Research Society ("SRS").

CMC is not included among the parties listed in Exhibit E of the settlement agreement. It is also not one of the organizations named in the definition of the term "Professional Societies." Thus, the express language of the purpose statement contained in the AcroMed settlement agreement supports the conclusion that the agreement was not intended to settle claims brought against CMC.

CMC contends that, in addition to claims against AcroMed, the released parties, and the professional societies, the settlement agreement also operates to bar claims against non-settling defendants. The term "Non-Settling Defendant" is defined as follows:

> **"Non-Settling Defendant"** shall mean any person or entity that is not AcroMed or a Released Party as defined herein but that is named as

> a defendant in any pending or future action or litigation alleging injury or damage as a result of the implantation of any Orthopedic Bone Screw.

We agree that CMC qualifies as a non-settling defendant within the meaning of this definition.

We conclude, however, that the AcroMed settlement agreement does not provide for the dismissal of claims against non-settling defendants. Rather, the agreement serves to enjoin non-settling defendants from maintaining an action for contribution, indemnity, or subrogation against AcroMed or the released parties. The agreement requires class members to deposit into the settlement fund any money received from non-settling defendants and provides that such proceeds shall not be disbursed until the claims against the non-settling defendant are either dismissed with prejudice or until the non-settling defendant releases any third party claims that it may have against AcroMed and/or the released parties. Additionally, it authorizes the administrator of the settlement fund to consider the extent to which non-AcroMed bone screw recipients have been compensated by non-settling defendants when deciding whether to make funds available to this class of plaintiffs. Finally, the agreement states that judgments obtained against non-settling defendants shall be reduced by any amount that the non-settling party is entitled to recover from AcroMed or the released parties. Thus, the language of the AcroMed settlement agreement contemplates that members of the settlement class might obtain judgments against defendants such as CMC that did not participate in the settlement.

Accordingly, we find that the AcroMed settlement agreement releases any settled claims that Bryant may have against AcroMed, the released parties, and the professional societies but does not require the dismissal of Bryant's claims against any non-settling defendant, including CMC.

### Statute of Limitations

At trial, CMC argued that all of Bryant's claims against CMC were barred by the statute of limitations. The trial court found that, with the exception of Bryant's claim that CMC did not inform her that she might experience pain, discomfort, and abnormal sensations and that her pain

level might worsen after the 1993 surgery, Bryant's claims are not barred by the applicable statute of limitations. CMC does not challenge this ruling on appeal. Bryant, however, contends that the trial court erred in finding that her pain related lack of informed consent claims are untimely.

Causes of action based on lack of informed consent are subject to the same limitations period as medical malpractice claims. *See Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998). The statute of limitations applicable to medical malpractice claims states in pertinent part as follows:

> (1) The statute of limitations in malpractice actions shall be one (1) year as set forth in § 28-3-104.
> (2) In the event the alleged injury is not discovered within the said one (1) year period, the period of limitation shall be one (1) year from the date of such discovery.

Tenn. Code Ann. § 29-26-116 (a) (1980). The two surgeries that Dr. McCord performed on Bryant at CMC took place on May 3, 1993 and February 21, 1994. Bryant did not file her complaint against CMC until March 18, 1996. Thus, CMC contends that Bryant's claims arising out of these two surgeries are untimely.

In considering whether Bryant's lack of informed consent claims related to pain experienced after the May 1993 surgery are barred by the statute of limitations, we must first determine the date on which Bryant discovered her injuries. In *Shadrick v. Coker*, 963 S.W.2d 726 (Tenn. 1998), Shadrick underwent a surgical procedure on March 12, 1990 involving the implantation of pedicle screws. *See id.* at 728. After the surgery, Shadrick's pain worsened and in September of 1990, an X-ray revealed that one of the screws had broken. *See id.* at 729. In November of 1990, the pedicle screws were surgically removed from Shadrick's back. *See id.* Shadrick continued to experience pain even after the screws were removed. *See id.* Dr. Coker, Shadrick's surgeon, did not attribute Shadrick's continued pain to the use of pedicle screws. *See id.* Rather, he explained that this pain might be due to inflammation or scarring and also expressed his belief that Shadrick had a low tolerance for pain. *See id.* On December 17, 1993, Shadrick viewed a television program reporting that pedicle screws were experimental, had not been approved for use in the spine, and had caused a number of problems in patients in whom they had been implanted. *See id.*

On December 16, 1994, Shadrick filed an action against Dr. Coker and CMC, the facility where his surgeries were performed, alleging that he had not been informed of the risks associated with the use of pedicle screws prior to the surgery. *See id.* Dr. Coker and CMC filed identical motions for summary judgment, claiming that Shadrick's claims were barred by the one year statute of limitations applicable to medical malpractice claims. *See id.* at 730. The trial court granted the motion to dismiss. *See id.* On appeal, the Tennessee Supreme Court noted as follows:

> [T]he statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant. . . . "It is knowledge of facts sufficient to put a plaintiff on notice that an injury has been sustained which is crucial." *Stanbury,* at 678. Such knowledge includes not only an awareness of the injury, but also the tortious origin or wrongful nature of that injury.

*Id.* at 733-34 (quoting *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997); *Roe v. Jefferson*, 875 S.W.2d 653, 657-58 (Tenn. 1994); *Hathaway v. Tennessee Anesthesiology, P.C.*, 724 S.W.2d 355, 359 (Tenn. App. 1986)). The court then concluded that, because he had been told that the use of pedicle screws was a "routine treatment" and because Shadrick's surgeon offered other explanations for Shadrick's continued pain, there was evidence from which a jury could find that Shadrick did not discover his cause of action until December of 1993. *See id.* at 734. Thus, the court held that there was a genuine issue of material fact regarding when the statute of limitations began to run. *See id.* at 735.

In the present case, Bryant experienced back pain prior to her referral to Dr. McCord. Her pain worsened, however, after she underwent surgery in May of 1993. Bryant stated that it never occurred to her after the May 1993 surgery that she might have a cause of action because Dr. McCord had explained that, if the May 1993 surgery was unsuccessful, Bryant may have to undergo a second surgical procedure. Like the plaintiff in *Shadrick*, Bryant also viewed a television program regarding the dangers of pedicle screws. Bryant became concerned and discussed the program with Dr. McCord during her next visit. Dr. McCord reassured Bryant that the screws used during her surgery were different from and of a higher qualify than the ones discussed on the television

program.

Applying the holding in ***Shadrick*** to the case at bar, we must conclude that, because Dr. McCord allegedly attempted to persuade Bryant that the screws implanted in her spine were not the cause of her continuing pain, there is a genuine issue of material fact regarding when Bryant should have reasonably known that the pain she experienced after the May 1993 surgery was the result of the screws used by Dr. McCord. While Bryant was certainly aware of her pain immediately following the May 1993 surgery, a jury could reasonably conclude that she was not aware of the tortious origin of her pain until sometime thereafter. Thus, we hold that the trial court erred in finding that Bryant's lack of informed consent claims relating to pain experienced after the May 1993 surgery are barred by the statute of limitations.

### *Lack of Informed Consent*

Bryant contends that CMC failed to obtain her informed consent prior to the performance of the May 1993 and February 1994 surgeries. CMC, however, argues that it had no legal duty to obtain Bryant's informed consent.

Bryant filed with the trial court affidavits from three physicians concluding that CMC had a duty to obtain Bryant's informed consent prior to each of the surgical procedures performed on Bryant. Expert testimony, however, should not be considered when determining whether a defendant owes a legal duty to a plaintiff. ***See Coffey v. Knoxville***, 866 S.W.2d 516, 519 (Tenn. 1993). Rather, the existence or nonexistence of a duty is entirely a question of law to be determined by the court. ***See, e.g., Blair v. Campbell***, 924 S.W.2d 75, 78 (Tenn. 1996). Thus, in determining whether CMC had a duty to obtain Bryant's informed consent, we will disregard the legal conclusions contained in the affidavits of Bryant's expert witnesses.

It is well established in Tennessee that a physician has a duty to obtain the informed consent of his or her patient before administering a treatment or performing a surgical procedure on the patient. ***See, e.g., Shadrick***, 963 S.W.2d at 732 (citing ***Cardwell v. Bechtol***, 724 S.W.2d 739, 750 (Tenn. 1987)). The law in Tennessee is silent, however, regarding whether the hospital where

the treatment is administered or the surgical procedure is performed also has a duty to obtain the patient's informed consent. Other jurisdictions that have considered this question have repeatedly held that hospitals generally do not have a duty to obtain the patient's informed consent. *Krane v. Saint Anthony Hosp. Sys*, 738 P.2d 75, 77 (Colo. Ct. App. 1987); *Petriello v. Kalman*, 576 A.2d 474, 478 (Conn. 1990); *Valcin v. Public Health Trust of Dade County*, 473 So. 2d 1297, 1307 (Fla. Dist. Ct. App. 1984), *approved in part and quashed in part on other grounds*, 507 So. 2d 596 (Fla. 1987); *Parr v. Palmyra Park Hosp.*, 228 S.E.2d 596, 597-98 (Ga. Ct. App. 1976); *Pickle v. Curns*, 435 N.E.2d 877, 880-81 (Ill. App. Ct. 1982); *Auler v. Van Natta*, 686 N.E.2d 172, 175 (Ind. Ct. App. 1997); *Pauscher v. Iowa Methodist Medical Ctr.*, 408 N.W.2d 355, 362 (Iowa 1987); *Lincoln v. Gupta*, 370 N.W.2d 312, 318 (Mich. Ct. App. 1985); *Baltzell v. Baptist Medical Ctr.*, 718 S.W.2d 140, 142 (Mo. Ct. App. 1986); *Giese v. Stice*, 567 N.W.2d 156, 164 (Neb. 1997); *Johnson v. Sears, Roebuck & Co.*, 832 P.2d 797, 800 (N.M. Ct. App. 1992); *Fiorentino v. Wenger*, 227 N.E.2d 296, 301 (N.Y. 1967); *Cox v. Haworth*, 283 S.E.2d 392, 395-96 (N.C. Ct. App. 1981); *Kershaw v. Reichert*, 445 N.W.2d 16, 17 (N.D. 1989); *Goss v. Oklahoma Blood Inst.*, 856 P.2d 998, 1007 (Okla. Ct. App. 1990); *Kelly v. Methodist Hosp.*, 664 A.2d 148, 150 (Pa. Super. Ct. 1995); *Ritter v. Delaney*, 790 S.W.2d 29, 32 (Tex. Ct. App. 1990); *Howell v. Spokane & Inland Empire Blood Bank*, 785 P.2d 815, 822-23 (Wash. 1990); *Cross v. Trapp*, 294 S.E.2d 446, 459 (W. Va. 1982). The underlying rationale of these decisions has been stated as follows:

> It is the surgeon, and not the hospital, who has the technical knowledge and training necessary to advise each patient of the risks of the surgery prior to the patient giving his consent. Further, the hospital does not know the patient's medical history, nor the details of the particular surgery to be performed.

*Krane*, 738 P.2d at 77. Additionally, one court commented that "[t]o impose upon a hospital the duty to inform would be to require a hospital to intervene into the physician/patient relationship" and concluded that this result would be "more disruptive than beneficial to [the] patient." *Goss*, 856 P.2d at 1007 (quoting *Howell*, 785 P.2d at 822).

We agree that the duty to obtain a patient's informed consent prior to the performance of a surgical procedure lies exclusively with the patient's physician. Thus, there is no duty on the part of the hospital to give the patient information, to ensure that the patient understands any

information received from other sources, such as the patient's physician, or to obtain the patient's consent prior to the scheduled procedure. Similarly, we do not think that the hospital has a duty to ensure that the patient's physician has carried out his or her duty to obtain the patient's informed consent. We agree with the court in *Goss* that such a rule would require hospitals to unnecessarily interfere with the physician/patient relationship. *See id.*

At least one jurisdiction has recognized a limited exception to the general rule that the law does not impose on a hospital a duty to obtain informed consent from its patients. In *Friter v. Iolab Corp.*, 607 A.2d 1111 (Pa. Super. Ct. 1992), the plaintiff underwent cataract surgery involving the implantation of a type of lens that had not been approved by the United States Food and Drug Administration (FDA) and that was the subject of a clinical study designed to test its safety. *See id.* at 1111. FDA regulations required hospitals participating in the study to obtain informed consent from any patient undergoing this experimental treatment. *See id.* The plaintiff brought an action against the hospital, alleging that he was not informed prior to the surgery that he was a participant in the study or that the experimental lens would be implanted in his eye during the surgery. *See id.* at 1111-1112. While noting the general rule that hospitals do not have an independent duty to obtain informed consent, the court found that, by participating in an experiment that was subject to the FDA regulations, the hospital assumed a duty to obtain the patient's informed consent. *See id.* at 1115.

In *Corrigan v. Methodist Hosp.*, 158 F.R.D. 70 (E.D. Pa. 1994), the plaintiff underwent back surgery involving the implantation of devices similar to those implanted in the instant case. *See id.* at 71-72. The plaintiff asserted a claim against the hospital where the procedure was performed, alleging that the hospital knew that his surgery was performed as part of an informal clinical study, that the FDA had restricted the sale of these devices to approved institutions, and that the hospital was not one of those institutions. *See id.* at 73. The plaintiff argued that, under such facts, *Fritter* imposed on the hospital an independent duty to obtain his informed consent. *See id.* The court found that the plaintiff had alleged facts sufficient to maintain a cause of action against the hospital for lack of informed consent and thus held that the trial court should have denied the hospital's motion for judgment on the pleadings. *See id.*

In the instant case, Bryant alleges that CMC failed to inform her (1) that pedicle screws were not approved by the FDA for use in spine surgery, (2) that pedicle screws were classified by the FDA as experimental or investigational, and (3) that there were medical problems and other risks associated with the use of pedicle screws. She does not allege, however, that the devices used by Dr. McCord were implanted in her spine as part of a clinical study. We think that the duty imposed by *Friter* and *Corrigan* is limited to situations in which the hospital, by virtue of its participation in a clinical study, is subject to FDA regulations and applies only when the patient is actually a subject in the study. In the case at bar, it is undisputed that Bryant was not involved in any FDA regulated study. Thus, we conclude as a matter of law that CMC had no duty to obtain her informed consent. Accordingly, we hold that the trial court did not err in granting CMC's motion for summary judgment with respect to Bryant's informed consent claim.

### *Hospital Malpractice*

The trial court also granted summary judgment in favor of CMC with respect to Bryant's hospital malpractice claim. On appeal, Bryant contends that CMC (1) failed to verify that Bryant had given her informed consent and permitted the use of a misleading and inaccurate consent form, (2) failed to monitor and control the use of investigational devices used in surgeries performed at CMC, and (3) failed to enforce policies governing the obtaining of informed consent. Bryant's first and third allegations are related to her claim against CMC based on lack of informed consent. In addressing this claim, we held that the duty to obtain a patient's informed consent lies with the patient's physician, not with the hospital where the procedure is performed. Similarly, we held that there is no duty on the part of the hospital to ensure that the physician has obtained the patient's informed consent prior to the performance of the scheduled procedure. Thus, we consider only whether the trial court erred in finding that there are no genuine issues of material fact and that CMC is entitled to a judgment as a matter of law regarding Bryant's claim that CMC violated a duty owed to her in failing to monitor the use of investigational devices used in surgeries performed at CMC.

Bryant asserts the position that her hospital malpractice claim is predicated on the doctrine of corporate negligence. The doctrine of corporate negligence imposes liability on a

hospital for the breach of a duty of care owed by the hospital directly to the patient. *See, e.g., Clark v. Perry*, 442 S.E.2d 57, 65 (N.C. Ct. App. 1994). Under this legal theory, hospitals owe to patients four types of duties. These duties include as follows:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Penn. 1991)(internal citations omitted). The doctrine of corporate negligence has been recognized by at least seventeen jurisdictions outside of Tennessee. *See Tucson Medical Ctr., Inc. v. Misevch*, 545 P.2d 958, 960 (Ariz. 1976); *Elam v. College Park Hosp.*, 183 Cal. Rptr. 156, 157 (Cal. Ct. App. 1982); *Kitto v. Gilbert*, 570 P.2d 544, 550 (Colo. Ct. App. 1977); *Insinga v. LaBella*, 543 So. 2d 209, 214 (Fla. 1989); *Mitchell County Hosp. Auth. v. Joiner*, 189 S.E.2d 412, 414 (Ga. 1972); *Darling v. Charleston Community Memorial Hosp.*, 211 N.E.2d 253, 258 (Ill. 1965); *Ferguson v. Gonyaw*, 236 N.W.2d 543, 550 (Mich. Ct. App. 1975); *Gridley v. Johnson*, 476 S.W.2d 475, 484-85 (Mo. 1972); *Foley v. Bishop Clarkson Memorial Hosp.*, 173 N.W.2d 881, 884 (Neb. 1970); *Corleto v. Shore Memorial Hosp.*, 350 A.2d 534, 537-38 (N.J. Super. Ct. Law Div. 1975); *Raschel v. Rish*, 488 N.Y.S.2d 923, 925 (N.Y. App. Div. 1985); *Blanton v. Moses H. Cone Memorial Hosp., Inc.*, 354 S.E.2d 455, 457-58 (N.C. 1987); *Benedict v. St. Luke's Hosps.*, 365 N.W.2d 499, 504 (N.D. 1985); *Park N. Gen. Hosp. v. Hickman*, 703 S.W.2d 262, 266 (Tex. Ct. App. 1985); *Pedroza v. Bryant*, 677 P.2d 166, 170 (Wash. 1984); *Utter v. United Hosp. Ctr., Inc.*, 236 S.E.2d 213, 215 (W. Va. 1977); *Johnson v. Misericordia Community Hosp.*, 301 N.W.2d 156, 164 (Wis. 1981).

The courts of Tennessee have long recognized that hospitals have a legal duty to exercise reasonable care toward their patients. *See O'Quin v. Baptist Memorial Hosp.*, 201 S.W.2d 694, 697 (Tenn. 1947); *Keeton v. Maury County Hosp.*, 713 S.W.2d 314, 316 (Tenn. App. 1986). In *Crumley v. Memorial Hosp., Inc.*, 509 F. Supp. 531 (E.D. Tenn. 1979), *aff'd mem.*, 647 F.2d 164 (6th Cir. 1981), a federal court considered whether, under Tennessee law, a hospital could be held independently liable for the negligence of one of its anesthesiologists. The *Crumley* court

recognized that a hospital has a duty to use due care in the selection and retention of physicians practicing within its facility. *See id*. at 535. In *Prince v. Coffee County, Tennessee*, No. 01A01-9508-CV-00342, 1996 WL 221863 (Tenn. App. May 3, 1996), the plaintiff sustained injuries resulting from improperly administered anesthetic during out-patient surgery. *See id.* at *1. The plaintiff filed a claim against the hospital where the procedure was performed, alleging that it negligently failed to establish and enforce adequate anesthetic policies and procedures. *See id.* We reversed an order of the trial court granting summary judgment in favor of the hospital, finding that there were genuine issues of material fact precluding summary judgment. *See id.* at *5. In *Keeton v. Maury County Hosp.*, 713 S.W.2d 314 (Tenn. App. 1986), the seventy-nine year old plaintiff repeatedly called for a nurse to assist him in getting to the restroom. *See id.* at 315. Because no one appeared to assist him, the plaintiff attempted to go to the restroom alone, lost his balance, and fell to the floor. *See id.* at 316. We held in *Keeton* that, in failing to assist the plaintiff, the hospital did not exercise reasonable care toward the plaintiff. *See id.* at 318. Finally, in *Spivey v. St. Thomas Hosp.*, 211 S.W.2d 450 (Tenn. App. 1947), a delirious patient fell out of the window of his third floor hospital room. *See id.* at 451. We held that the hospital had a duty to prevent a patient in a delirious condition from getting out of bed and harming himself. *See id.* at 454.

Bryant urges us to expressly adopt the doctrine of corporate negligence. We find this to be unnecessary because we believe that it is already the law of this state that hospitals have a duty to use reasonable care to maintain their facilities and equipment in a safe condition, to select and retain only competent physicians, to supervise the care given to patients by hospital personnel, and to adopt and enforce rules and policies designed to ensure that patients receive quality care. As part of its duty to supervise the care given to patients, we think that a hospital must exercise at least a limited amount of control over the use of devices that are considered to be investigational. In opposition to CMC's motion for summary judgment, Bryant relies in part upon the affidavits of three physicians stating that the devices implanted in her spine at CMC were investigational. Additionally, Bryant relies upon a letter written by Dr. Robert Alford, CMC's Medical Director, suggesting that the use of pedicle screws in spine fixation surgery should be regarded as investigational. Finally, Bryant notes that CMC's institutional review board discussed Dr. Alford's letter and concluded that this usage of bone screws should be employed under "investigational protocol." CMC, however, denies that the devices implanted in Bryant's spine were investigational.

On the contrary, CMC alleges that these types of devices have been widely used in the medical community for many years. Whether a medical device is investigational is not a question that may be resolved on a motion for summary judgment but instead must be determined by the trier of fact after consideration of all of the evidence. We thus find that, in the instant case, the trial court erred in granting summary judgment in favor of CMC with respect to Bryant's hospital malpractice claim. On remand, the trier of fact must determine whether the devices implanted in Bryant's spine were investigational. If the trier of fact concludes that the devices were, in fact, investigational, it must then determine whether CMC violated its duty to monitor and control the use of these devices in its facilities.

### *Joint Enterprise*

Bryant also seeks to recover from CMC under the theory of joint enterprise. Bryant essentially claims that CMC was engaged in a joint venture with Dr. McCord, the purpose of which was to raise revenue by performing as many surgical procedures as possible at CMC. A joint venture is similar to a partnership and thus is subject to the same rules of law that apply to partnerships. *See, e.g., Federated Stores Realty, Inc. v. Huddleston*, 852 S.W.2d 206, 212 (Tenn. 1992). The law of Tennessee imposes joint and several liability on members of a partnership for the tortious acts committed by any partner in furtherance of the partnership. *See In re Sikes*, 184 B.R. 742, 747 (M.D. Tenn. 1995).

In order to establish that CMC and Dr. McCord were engaged in a joint venture, Bryant must show (1) that they shared a common purpose, (2) that there was an agreement between them, and (3) that they each had an equal right "to control both the venture as a whole and any relevant instrumentality." *Fain v. O'Connell*, 909 S.W.2d 790, 793 (Tenn. 1995)(quoting *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978)). The imposition of liability based on the existence of a joint venture is reserved for "cases in which the parties associate for business, or expense sharing, or some comparable arrangement." *Id.* (quoting *Cecil*, 575 S.W.2d at 272).

In the instant case, Bryant has alleged that CMC funded the hiring of a program coordinator who worked with CMC's marketing director to promote the services provided by Dr.

McCord and that CMC guaranteed a base salary to two members of Dr. McCord's staff. Bryant contends that, from these facts, a jury could conclude that CMC and Dr. McCord shared a common purpose and had reached an agreement regarding that purpose. We agree that these facts alleged by Bryant are sufficient to create a jury question with respect to these first two elements of a claim based on the theory of joint enterprise.

With respect to the third element of a joint venture, Bryant alleges that CMC instituted certain policies regarding the performance of surgeries at CMC, including a policy restricting surgeons from performing more than two back surgeries and one neck surgery per day. Bryant further alleges, however, that Dr. McCord sometimes violated this policy by scheduling three or four back surgeries in a single day and that CMC would allow Dr. McCord to do "whatever he wanted." Assuming the truth of these allegations, as we must for purposes of summary judgment, we cannot conclude that CMC and Dr. McCord shared equal control over their business relationship. On the contrary, it appears that Dr. McCord acted independently of CMC with respect to the care of his patients, ignoring the attempts of CMC to regulate the number of procedures that he performed per day. We thus find that Bryant has failed to state a claim against CMC under the theory of joint enterprise. Accordingly, we hold that the trial court properly granted CMC's motion for summary judgment regarding this claim.

### *Acting in Concert*

Finally, Bryant contends that CMC is subject to liability for her injuries under a concert of action theory. The courts of this state have recognized that "when two or more persons engage in an unlawful act and one of them commits a serious civil injury upon a person not engaged therein, all are equally liable for damages to the injured party." *Huckeby v. Spangler*, 521 S.W.2d 568, 573 (Tenn. 1975). The elements of a claim based on a concert of action theory include as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> > (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> > (b) knows that the other's conduct constitutes a breach of

> duty and gave substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to third person.

Restatement (Second) of Torts § 876(c). Bryant contends that by failing to supervise Dr. McCord and by allowing Dr. McCord to use its facilities when performing surgical procedures, CMC substantially assisted Dr. McCord in breaching his duty of care owed to Bryant. We disagree. The acts alleged by Bryant, even if proven to be true, would not constitute substantial assistance on the part of CMC. Thus, we conclude that Bryant has failed to state a claim under the theory of concert of action. Accordingly, we hold that the trial court properly granted CMC's motion for summary judgment with respect to this claim.

### *Conclusion*

For the foregoing reasons, we find (1) that the AcroMed settlement agreement does not require the dismissal of any of Bryant's claims against CMC, (2) that none of Bryant's claims against CMC are barred by the statute of limitations, (3) that the trial court properly granted CMC's motion for summary judgment with respect to Bryant's claims based on lack of informed consent, (4) that the trial court erred in granting CMC's motion for summary judgment with respect to Bryant's claims based on hospital malpractice, (5) that the trial court properly granted CMC's motion for summary judgment with respect to Bryant's joint enterprise claim, and (6) that the trial court properly granted CMC's motion for summary judgment with respect to Bryant's acting in concert claim.

We therefore affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion. Cost of appeal are charged one-half to Bryant and one-half to CMC, for which execution may issue if necessary.

_____

FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)


_____
TOMLIN, Sp. J. (Concurs)